**USIBELLI COAL MINE, INC., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES, Appellee.**

No. S–6650.

Supreme Court of Alaska.

Aug. 16, 1996.

Richard M. Johannsen and James N. Leik, Perkins Coie, Anchorage, for Appellant.

Lawrence Z. Ostrovsky, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COMPTON, C.J., RABINOWITZ, MATTHEWS and EASTAUGH, JJ., and CARPENETI, J. Pro Tem.*

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

We consider here whether Usibelli Coal Mine, Inc. (UCM) owes back royalties to the State of Alaska under three state coal leases for coal mined between 1989 and March 1993. The Alaska Department of Natural Resources (DNR) ruled administratively that it does. On appeal by UCM, the superior court

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

affirmed. We affirm the superior court's decision.

## II. *FACTS AND PROCEEDINGS*

DNR claims back royalties, plus interest, of $346,550.35 due on three noncompetitive coal leases held by UCM.[1] DNR entered into the three leases in accordance with the provisions for coal land in the Alaska Land Act (AS 38.05.005–.990). Each of these three leases has an indeterminate term, and requires the payment of both annual rentals and production royalties.[2] DNR issued the first lease, ADL 20633, on May 1, 1967, with an initial royalty of $0.10/ton. DNR issued the second lease, ADL 21545, on November 1, 1967, with an initial royalty of $0.05/ton. DNR originally issued these two leases to James A. Carroll, who assigned his interest in both leases to UCM in 1971. The leases are located on land patented to the State pursuant to the Alaska Mental Health En-

abling Act of 1956. DNR issued the third lease, ADL 56505, on April 13, 1972, with an initial royalty of $0.15/ton.[3]

The leases do not contain an expiration date for the initial royalties. However, in accordance with AS 38.05.150(d), the royalty terms cannot exceed a term of twenty years. Thus, the initial royalties on these leases expired on the twentieth anniversary of the date each lease was issued: May 1, 1987, November 1, 1987, and April 13, 1992, respectively.

In 1982, before the initial royalty term on any of these leases expired, DNR promulgated regulations setting a standard royalty rate of five percent of adjusted gross value (AGV) for noncompetitive state coal leases. 11 Alaska Administrative Code (AAC) 85.220 (1996). This rate was to be applied to existing leases at the time of royalty adjustment. *Id.*[4]

---

1. DNR originally calculated the amount of back royalties owed at $455,615.16, including interest. After receiving further information and an objection from UCM, DNR recalculated this amount as $352,560.95. DNR again corrected this amount in its superior court brief, after conceding that the prior interest calculation was in error. The final amount claimed by DNR is $346,550.35.

2. AS 38.05.150(d) dictates the maximum term, minimum rental, and minimum royalties for coal leases of state land. This section provides:

 For the privilege of mining or extracting the coal in the land covered by the lease, the lessee shall pay to the state the royalties specified in the lease. The royalties shall be fixed before offering the lease, and shall be effective for a period of not more than 20 years. The royalties shall be not less than five cents a ton of 2,000 pounds. The lessee shall also pay an annual rental, payable at the date of the lease and annually thereafter, on the land or coal deposits covered by the lease, at a rate fixed by the commissioner before offering the lease. The annual rental shall be effective for a period of not more than 20 years. The annual rental shall be not less than 25 cents an acre for the first year of the lease, not less than 50 cents an acre for the second year, third year, fourth year and fifth year, and not less than $1 an acre for each year thereafter during the continuance of the lease. The rental for each year shall be credited against the royalties as they accrue for that year. Each lease shall provide that the annual rental payment is subject to adjustment at intervals of no more than 20

 years and adjustments shall be based on the current rates for properties similarly situated. AS 38.05.150(d) (amended 1995).

3. Virtually all of the disputed royalty is attributable to two of the leases, ADL 21545 and ADL 20633. The appellate record does not contain a copy of ADL 56505.

4. 11 AAC 85.220 provides in relevant part:
 (a) The royalty rate must be set as follows, based on the adjusted gross value of coal from the leased area that is sold, disposed of, or consumed by the lessee:
 (1) five percent for noncompetitive leases;
 . . . .
 (b) For leases in existence on June 18, 1982, the royalty rate will be changed, at the next time of royalty adjustment, to five percent of the adjusted gross value.
 . . . .
 (d) For leases issued after June 18, 1982, the royalty rate is subject to adjustment by the commissioner not more frequently than every 10 years. The royalty adjustment must take into account the current royalty rates and other consideration being paid for coal of similar quality in the same general area or other relevant areas and all other relevant factors including changes in market conditions, transportation costs, the composition and special characteristics of the deposit, and the Btu content of the coal. A lease in existence on June 18, 1982, will be adjusted in accordance with the terms of the lease.
 (e) In this section and in 11 AAC 85.255, "adjusted gross value" means gross value less any deductions authorized under 11 AAC 85.225. 11 AAC 85.220 (1996).

Royalty adjustment for ADLs 20633 and 21545 was to occur in 1987. In March 1987, facing the prospect of royalties of five percent of AGV on these leases, UCM asked DNR to grant it royalty relief pursuant to AS 38.05.140(d).[5] UCM requested that royalties for the two leases be set at the equivalent of two percent of AGV. While this request was pending, UCM began paying royalties at the rate of five percent of AGV on each lease when its initial royalty term expired.

In April 1988 DNR denied the reduction requested by UCM, but agreed to phase in the full five percent royalty rate pursuant to AS 38.05.140(d), so that the full rate would not be applied to UCM's leases until May 1, 1990.[6] UCM requested reconsideration, arguing among other things that the coal royalty and royalty relief regulations were invalid.

On reconsideration, DNR granted UCM further royalty relief, to facilitate UCM's negotiations on its existing export contract with Suneel Alaska Corporation (Suneel). In its October 11, 1988 decision, DNR decided that the April decision would continue to control UCM's royalty payment obligations until December 31, 1988. Effective January 1, 1989, UCM was to pay a royalty of five percent of AGV on any production up to 800,000 tons of coal from the two leases collectively per year. All production in excess of 800,000 tons would carry a reduced royalty rate of $0.29/ton. At the beginning of each year, UCM was to submit a calculation of its estimated weighted average five percent AGV for the calendar year, and was to submit an adjusted royalty return after the end of the year to reflect actual volumes and proceeds. The royalty reduction was to be effective "for the same term as any contract extension negotiated with Suneel before January 1, 1989," but "in no event shall this decision be effective past December 31, 1990." Beginning January 1, 1991, the royalty rate on all production from the two leases was to be five percent of AGV.

In January 1989 UCM submitted its estimate of royalty for calendar year 1989. In its supporting calculations, UCM applied the five percent royalty to the adjusted gross value of UCM's coal at the mine face.[7] UCM based its calculation of AGV on the estimated average sales price "Net of State Royalty," less statutory deductions for transportation and beneficiation costs, and deductions for the federal reclamation royalty (AML reclamation fee) and the federal black lung excise tax.[8] UCM also used this method for calculating AGV in its estimate of royalties for calendar years 1990 and 1991.

DNR first informed UCM that its royalty payments calculated under this method were incorrect in a March 1991 letter in which DNR rejected UCM's royalty calculation for calendar year 1990. DNR informed UCM that the calculation submitted was in error, as "[t]he regulations only grant a deduction for transportation and beneficiation costs and rental," and do not allow deductions such as those taken by UCM for the federal reclamation royalty and federal black lung excise tax. UCM did not respond.

In May 1991 DNR again contacted UCM concerning the deficiency in UCM's royalty calculation for calendar year 1990. DNR also informed UCM that its royalty calculation for calendar year 1989 and its subsequent payment were deficient for the same reasons. DNR notified UCM that it owed back royalty payments for calendar years

---

5. AS 38.05.140(d) provides in relevant part:
 The commissioner, for the purpose of encouraging the greatest ultimate recovery of coal ... and in the interest of conservation of natural resources, after public hearing, ... may waive, suspend, refund, or reduce the rental, or minimum royalty, or reduce the royalty on an entire leasehold, or on any tract or portion of a leasehold segregated for royalty purposes, whenever the commissioner determines that it is necessary to do so in order to promote development, or that the lease cannot be successfully operated under its terms.

6. The Commissioner also granted UCM partial royalty credit for those payments it had made based on the five percent of AGV rate, in order to be consistent with the phased payment schedule.

7. The five percent rate was applied to the first 800,000 tons of coal pursuant to the royalty negotiations.

8. UCM's contracts provide that its customers will reimburse them for these taxes, fees, and royalties.

1989 and 1990, and for the first quarter of 1991. DNR requested that payment be made with UCM's next royalty payment; if not, the state's legal rate of interest would be imposed on the back payments owed. Again, UCM did not respond.

In March 1992 UCM submitted its adjusted royalty return to reflect actual volumes and proceeds for calendar year 1991. UCM used the same method of calculating AGV that it had used for the previous two years, with the addition of a deduction for the severance tax imposed by the new Denali Borough. Two weeks later, DNR notified UCM that the royalty calculations were again in error, and demanded payment for back royalties due for calendar years 1989, 1990, and 1991. Once again UCM did not respond.

DNR scheduled several meetings with UCM representatives to discuss the royalties and the issue of back payments. At a meeting in November 1992, then-Commissioner Olds suggested that it might be possible to settle the dispute by forgiving the 1989 back royalty, if all other amounts due were paid in full. However, DNR was later advised by the Attorney General that such a settlement was not acceptable, and that UCM would have to pay the full amount of any back royalty owed. The Attorney General advised DNR that pursuant to the state's fiduciary responsibility under the Mental Health Settlement, all back royalties owed must be paid.

On December 9, 1992, the Director of the Division of Mining issued a decision requiring that UCM pay all back royalties owed. The Commissioner concurred in the decision. The Director expressly stated that forgiveness of the 1989 royalties was denied, and ordered UCM to "[p]lease recalculate the royalties owed from 1989 to present without the deductions for the Black Lung Tax, AML Fee, State Royalty, and Denali Borough Severance Tax."

UCM requested reconsideration of the December 9 decision. In a final decision of May 14, 1993, the Commissioner affirmed the Director's determination that UCM owed all back royalties from 1989 to "the present." UCM appealed DNR's decision to the superior court. The superior court affirmed the decision, and remanded to DNR with instructions to correct the amount due to reflect an error made in calculating the interest. UCM appeals.

## III. DISCUSSION

### A. Standard of Review

■ When the superior court acts as an intermediate court of appeal, we give no deference to the lower court's decision. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987). Instead, we independently review the merits of the underlying administrative decision. *Id.* We have articulated four principal standards of review for administrative decisions.

> The "substantial evidence" test is used for questions of fact. The "reasonable basis" test is used for questions of law involving agency expertise. The "substitution of judgment" test is used for questions of law where no expertise is involved. The "reasonable and not arbitrary" test is used for review of administrative regulations.

*Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992) (citing *Jager v. State*, 537 P.2d 1100, 1107 n. 23 (Alaska 1975)).

### B. Administrative Res Judicata

■ The threshold question is whether administrative res judicata bars UCM's challenge. The State argues that UCM is barred from challenging DNR's royalty regulations, because it questioned the validity of those regulations in its Application for Reconsideration of DNR's April 1988 decision denying UCM's request for full royalty relief. The State argues that UCM "expressly accepted" application of the royalty regulations by failing to appeal DNR's October 11, 1988 decision that granted it partial royalty relief. The State argues further that UCM "accepted and acknowledged the [royalty regulations] long ago" by submitting royalty calculation statements and paying royalties based on the 1988 decision.

UCM responds that res judicata is not

appropriate in this case.[9] It contends that it had no reason to appeal the April 1988 decision, which granted UCM a royalty rate reduction. Although UCM's legal counsel did argue at the time that the royalty regulations might be invalid, DNR never addressed the argument or decided the issue. UCM argues that "[b]ecause this purely legal issue has never been addressed, resolved, or actually determined or decided within the meaning of DNR's own regulation, there is no bar to raising it now."[10]

We have held that "[t]he rule of res judicata applies to administrative agencies as well as courts." *Colville Envtl. Servs., Inc. v. North Slope Borough*, 831 P.2d 341, 345 n. 4 (Alaska 1992). "Thus if a claim could have been raised before an agency in a prior administrative hearing, res judicata precludes subsequent litigation of the same claim." *Calhoun v. State, Dep't of Transp. and Pub. Facilities*, 857 P.2d 1191, 1195 (Alaska 1993). However, "[r]es judicata cannot apply in the absence of 'a judgment to which res judicata could attach.'" *Municipality of Anchorage v. Frank Coluccio Constr. Co.*, 826 P.2d 316, 324 n. 7 (Alaska 1992) (quoting *C.J.M. Constr., Inc. v. Chandler Plumbing & Heating, Inc.*, 708 P.2d 60, 61 n. 1 (Alaska 1985)). For purposes of res judicata, a final judgment "includes 'any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.'" *Briggs v. State, Dep't of Pub. Safety*, 732 P.2d 1078, 1082 (Alaska 1987) (quoting Restatement (Second) of Judgments § 13 (1982)). Factors considered in determining finality are "'that the parties were fully heard, that the court supported its decision with a reasoned opinion, that the decision was subject to appeal or was in fact reviewed

on appeal.'" *Id.* (quoting Restatement (Second) of Judgments § 13 cmt. g (1982)).

In this case, UCM raised an objection to the validity of the regulations in 1988, when it requested reconsideration of DNR's denial of its request for royalty relief pursuant to AS 38.05.140(d). However, the Commissioner did not address this argument in his final decision, and appears to have given it no consideration. Therefore, there was no prior adjudication of this issue by DNR. Consequently, it is not appropriate to apply res judicata in this case.

## C. *Validity of the Regulations*

### 1. *Was there a valid delegation of rulemaking authority to DNR to adjust royalty rates for coal leases?*

In 1982, DNR promulgated regulations setting a standard royalty rate on noncompetitive coal leases. 11 AAC 85.220 (1996); 11 AAC 85.225 (1996). UCM argues that the legislature neither expressly nor impliedly granted DNR authority to adjust royalty rates on existing leases, but rather reserved that power to itself.[11] The State counters that the regulations were validly promulgated by DNR within its rule-making authority.

This question is one of statutory interpretation. In addressing questions of statutory interpretation, the court substitutes its independent judgment for that of the agency. *Fairbanks N. Star Borough Sch. Dist. v. NEA–Alaska, Inc.*, 817 P.2d 923, 925 (Alaska 1991). "Even under the independent judgment standard, however, the court gives some weight to what the agency has done,

---

9. We find unpersuasive UCM's argument that res judicata is not appropriate here because the validity of DNR's regulations is a purely legal, not factual, issue. We have held that administrative adjudications are given the same preclusive effect as judicial adjudications. *Johnson v. Alaska State Dep't of Fish & Game*, 836 P.2d 896, 908–09 (Alaska 1991).

10. UCM cites DNR's regulation that a "decision" requires a "written determination by the department specifying the details of the action taken." 11 AAC 02.080(3) (1996).

11. UCM argues that the legislature intended to retain the authority to adjust royalty rates in part because "the twenty-year period extends so far into the future." This argument is unpersuasive. There is nothing in the Alaska Land Act which suggests that the legislature intended to retain this revisory capacity; nor has it ever expressed disapproval of DNR's royalty regulations. *See Boehl v. Sabre Jet Room, Inc.*, 349 P.2d 585, 590 (Alaska 1960) (noting in upholding agency action that the "legislature, which meets annually, may revise the statute and thus restrict the bounds of administrative action").

especially where the agency interpretation is longstanding." *Id.* (citation omitted).

■ The Alaska Land Act (AS 38.05.005–.990) was enacted in 1959. The Act contains no express delegation of authority to DNR to fix or adjust coal lease royalty rates.[12] However, a grant of rulemaking authority can be either express or implied. AS 44.62.030. Therefore, we must determine whether a delegation of authority is implied in this case. *See Chevron U.S.A. Inc. v. LeResche,* 663 P.2d 923, 928 (Alaska 1983) (holding that a section of a statute implied agency authority to adopt regulations); *Boehl v. Sabre Jet Room, Inc.,* 349 P.2d 585, 587–88 (Alaska 1960) (holding that a grant of generalized power to "effectuate and carry out the purpose" of an act was an implied delegation of authority to adopt the regulations in question).[13]

In *Chevron,* we considered a challenge to the validity of DNR regulations which required that a miscellaneous land use permit be obtained from DNR for all oil and gas exploration on state lands. 663 P.2d at 924. In exchange for the permit, explorers had to agree to submit to the Department certain geological and geophysical data and information derived from exploration. *Id.*

In determining whether the legislature delegated rule-making authority to the Department, we considered two sections of the Alaska Land Act. *Id.* at 928. Alaska Statute 38.05.020(b)(1) authorizes DNR to "establish reasonable procedures and adopt reasonable rules and regulations necessary to carry out" the Alaska Land Act. *Id.* Alaska Statute 38.05.180(a), (b), (c), (e), and (f) imposes on DNR "the responsibility to maximize State return from State owned oil and gas

resources through careful planning, including presale analysis of tracts proposed for lease." *Id.*

We held that these two statutes, considered together, implied the authority to adopt the challenged regulations. *Id.* We explained that the planning and pre-sale analysis with which DNR was charged required that it "have access to the most reliable geological and geophysical data available." *Id.* Thus, the regulations were "reasonably necessary to insure that the planning process is carried out responsibly." *Id.*

In this case, we consider AS 38.05.020(b)(1), AS 38.05.145(a), and AS 38.05.150(d) in determining whether the challenged regulations are impliedly authorized.

Alaska Statute 38.05.020(b)(1) gives DNR the power to adopt regulations necessary to carry out the Alaska Land Act. It provides that the commissioner may

> establish reasonable procedures and adopt reasonable regulations necessary to carry out this chapter and, whenever necessary, issue directives or orders to the director to carry out specific functions and duties; regulations adopted by the commissioner shall be adopted under the Administrative Procedure Act (AS 44.62). . . .

This is a broad grant of rulemaking authority. *See Warner v. State,* 819 P.2d 28, 32 n. 3 (Alaska 1991) (noting cases in which the court evaluated the scope of an agency's implied authority under statutes conferring broad grant of rulemaking authority).

Alaska Statute 38.05.145(a) gives DNR the authority to promulgate regulations for the disposition of coal deposits under the leasing procedure.[14] It provides in relevant part:

---

12. The legislative history is silent as to whether the legislature intended to delegate this authority to DNR.

13. In assessing the validity of an administrative regulation, we determine "whether the legislature delegated rule-making authority to the Department, whether the Department followed the Administrative Procedure Act in promulgating the regulation, and whether the regulation is consistent with and reasonably necessary to implement the statutes authorizing its implementation." *Chevron U.S.A. Inc. v. LeResche,* 663 P.2d 923, 927 (Alaska 1983) (citing *Kelly v. Zamarello,*

486 P.2d 906, 911 (Alaska 1971)). UCM does not contend that DNR failed to follow the Administrative Procedure Act (APA) in promulgating these regulations. Consequently, we only review the delegation of rule-making authority to DNR and the consistency with and reasonable need for the regulations in order to implement the statute authorizing them.

14. UCM argues that AS 38.05.145(a) is not implicated here, because the "disposition" of the coal that is the subject of UCM's existing leases has already occurred. We find this argument unpersuasive.

Deposits of coal, phosphates, oil shale, sodium, potassium, oil, gas, geothermal resources and state land containing these deposits are subject to disposition under regulations, recommended by the director and adopted by the commissioner, and the provisions of AS 38.05.145—38.05.181.

The disposition of these deposits is limited by the application of AS 38.05.150(d), which specifies maximum terms and minimum rents and royalties for coal leases.

When considered together, these statutes impliedly authorize DNR to promulgate regulations regarding coal royalty rates and adjustments to those rates. The authority to adjust royalty rates is "reasonably necessary" to DNR's discharge of its statutory mandate to lease coal deposits on state lands. Fixing and adjusting royalties is an integral part of this disposition, and is essential to effective administration of coal leasing on state lands. Consequently, we find that the regulations promulgated to effectuate the purpose of these statutes are valid.

2. *Are the regulations unconstitutional and void as applied because of a lack of sufficient standards and procedures?*

 UCM argues that even if the delegation of authority can be implied, it is not attended by the statutory standards and procedural safeguards necessary for the valid exercise of agency authority. DNR responds that statutory standards and procedural safeguards do not need to be explicitly listed in the authorizing statute, and that sufficient standards and procedures are present.

 We have adopted a sliding-scale approach in analyzing the validity of a delegation of authority to an administrative agency. *State v. Fairbanks N. Star Borough,* 736 P.2d 1140, 1143 (Alaska 1987) (per curiam opinion expressly adopting superior court's opinion and sliding scale approach). "[T]he

constitutionality of a delegation is determined on the basis of the scope of the power delegated and the specificity of the standards to govern its exercise. 'When the scope increases to immense proportions ... the standards must be correspondingly more precise.'" *Id.* (quoting *Synar v. United States,* 626 F.Supp. 1374, 1387 (D.D.C.), *aff'd on other grounds,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986)). These standards may be either explicit, or implicit.[15] *Municipality of Anchorage v. Anchorage Police Dep't Employees Ass'n,* 839 P.2d 1080, 1086 (Alaska 1992).

In *Fairbanks North Star Borough,* a delegation doctrine challenge was brought against a statute endowing the Governor with the power to reduce appropriations when anticipated revenues appeared inadequate to meet appropriation levels. 736 P.2d at 1142. This court upheld the superior court's finding that the "legislature ha[d] articulated no principles, intelligible or otherwise, to guide the executive." *Id.* at 1143. Because "it authorize[d] the exercise of sweeping power over the entire budget with no guidance or limitation," we held that the statute was an unconstitutional delegation of legislative power.[16] *Id.* at 1142–43.

In *Municipality of Anchorage,* we applied a sliding-scale analysis to the Anchorage Municipal Assembly's delegation of power to a private arbitrator to make final and binding determinations in certain labor contract disputes. 839 P.2d at 1080. This is "a fairly narrow area, albeit an important one," and because a panoply of implied standards created "an elaborate and detailed structure which guides the arbitrator's decisions and guards against arbitrary action," we upheld the delegation as a valid delegation of authority. *Id.* at 1086–89.

In this case, the legislature has delegated authority to DNR to regulate in the field of

---

15. In *Municipality of Anchorage,* we suggested that the delegation doctrine should be animated more by due process concerns than by separation of powers principles. 839 P.2d at 1086 n. 12. "The key should no longer be statutory words; it should be the protections the administrators in fact provide, irrespective of what the statutes say or fail to say." *Id.* (quoting 1 Kenneth C. Davis,

*Administrative Law Treatise* § 3:15, at 206–07 (2d ed. 1978)).

16. The legislature subsequently enacted curative legislation ratifying and approving the governor's restrictions. Ch. 9, SLA 1987. We subsequently upheld these restrictions in *Fairbanks N. Star Borough v. State,* 753 P.2d 1158 (Alaska 1988).

coal leases on state land. Because coal leasing on state lands is a narrow area or field, this is a delegation of "broad authority to an agency with expertise to regulate a narrowly defined field." *Fairbanks N. Star Borough,* 736 P.2d at 1143 (citing *Boehl,* 349 P.2d at 588). Consequently, there is less need for explicit, detailed standards to guide agency action. *See Walker v. Alaska State Mortgage Ass'n,* 416 P.2d 245, 254 (Alaska 1966) (holding that a statute which stated its purposes and specified its powers and limitations permissibly delegated power to a public corporation); *DeArmond v. Alaska State Dev. Corp.,* 376 P.2d 717, 723 (Alaska 1962) (holding that the statement of purpose and the general limitations on loans provided sufficient standards to guide the corporation in adopting regulations and procedures for loan policy); *Boehl,* 349 P.2d at 590 (holding that it is "not essential ... that the legislature circumscribe administrative discretion by express standards of action" in order to sustain a delegation of broad, generalized power when "[t]he exercise of [administrative] powers is hedged about by substantial safeguards").

There are also a number of standards and safeguards pertaining to DNR's adjustment of royalty rates, both express and implied. Alaska Statute 38.05.150(d) requires that royalty terms not exceed twenty years, thus setting an outer time limit in which royalties must be adjusted. It also requires a five cent per ton minimum royalty. This requirement sets a floor for regulations adjusting royalties. Further standards include the constitutional mandate to encourage development consistent with the public interest [17] and to provide for the utilization, conserva-

tion, and development of the state's natural resources for the maximum benefit of the people.[18] These broad constitutional mandates guide DNR's promulgation of regulations pursuant to AS 38.05.020, .145(a), and .150(d).[19] *See Kenai Peninsula Fisherman's Coop. Ass'n v. State,* 628 P.2d 897, 907 (Alaska 1981) ("The extent of the Commissioner's power ... should ... be interpreted in light of the overall purpose of the constitutional and legislative scheme of management of state resources prescribed by other provisions of the law."). These standards "sufficiently mark[ ] the field within which the administrator is to act so that it may be known whether he has kept within it in compliance with the legislative will." [20] *Fairbanks N. Star Borough,* 736 P.2d at 1143 (quoting *Synar,* 626 F.Supp. at 1387). Consequently, we hold that there are sufficient standards and procedural safeguards to ensure the valid exercise of agency authority in this case.

### 3. *Are the regulations consistent with AS 38.05.150(d)?*

█ UCM argues that 11 AAC 85.220 and 11 AAC 85.225 are invalid because they are inconsistent with the plain meaning of AS 38.05.150(d), and are beyond the scope of DNR's authority to issue regulations. UCM argues that AS 38.05.150(d) must be construed together with the other mineral leasing sections of the Alaska Land Act because they are *in pari materia*—enacted at the same time and dealing with the same subject matter. UCM reasons that because sections of the Alaska Land Act relating to minerals expressly provide for percentage-based roy-

---

**17.** Article VIII, section 1 of the Alaska Constitution provides:
 *Statement of Policy.* It is the policy of the State to encourage the settlement of its lands and the development of its resources by making them available for maximum use consistent with the public interest.

**18.** Article VIII, section 2 of the Alaska Constitution provides:
 *General Authority.* The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people.

**19.** DNR's responsibilities in adopting regulations for the state's coal leasing program are confirmed by the authority conferred on DNR by AS 38.05.140(d) to reduce royalties "in order to promote development" and to order or agree to the suspension of production under a lease "in the interest of conservation."

**20.** The State also notes that royalty regulations were promulgated according to procedures specified by the Alaska APA (AS 44.62.010–.320). These procedures provided "substantial safeguards" for those who are subject to the regulations. *Boehl,* 349 P.2d at 590.

alties, and AS 38.05.150(d) does not contain any such provision, the legislature did not intend percentage-based royalties to be applied to coal leases.

DNR counters that a percentage-based royalty is consistent with AS 38.05.150(d); it also asserts that the mineral leasing sections of the Alaska Land Act are not *in pari materia* with AS 38.05.150(d), because they "do not conflict; they do not affect one another; they simply do not interact." Therefore, 11 AAC 85.220 and 11 AAC 85.225 are not inconsistent with the plain meaning of AS 38.05.150(d).

 We construe statutes that are *in pari materia* together. *Underwater Constr., Inc. v. Shirley*, 884 P.2d 150, 155 (Alaska 1994). "Statutes are deemed to be *in pari materia* when they relate to the same purpose or thing or have the same purpose or object." *State v. Eluska*, 724 P.2d 514, 517 (Alaska 1986) (Compton, J., dissenting). While coal leasing and other mineral leasing sections share the same general purpose of providing for the disposition of minerals on state lands, this is not sufficient to render them *in pari materia*, as they do not deal sufficiently with the same subject matter.

Consequently, we find that the percentage-based royalty contained in 11 AAC 85.220 does not conflict with the plain terms of AS 38.05.150(d). As the superior court noted, the statute does no more than set a minimum royalty, so that "the establishment of a royalty of 5% of adjusted gross value is consistent with the statute as long as it exceeds 5 [cents] a ton." Finally, as the superior court also observed, if the legislature had desired to restrict the royalties to either a flat fee or a percentage rate, we assume that it would have incorporated that requirement into the statute. Consequently, we hold that 11 AAC 85.225 and 11 AAC 85.220 do not conflict with the plain meaning of AS 38.05.150(d).

### D. *Contract*

 UCM argues that if the royalty can be changed to a percentage rate, the royalty amounts are "open terms" of the contract, and that the implied covenant of good faith and fair dealing requires that DNR negotiate appropriate adjustments rather than impose them unilaterally. The State responds that the leases expressly recognize that they are subject to the laws and regulations of the State, and that royalty adjustments need not be negotiated.

 This is a question of law that involves the expertise and specialized knowledge of DNR. Consequently, the reasonable basis standard of review applies. *State, Dep't of Revenue v. Atlantic Richfield Co.*, 858 P.2d 307, 308 (Alaska 1993).

 Given AS 38.05.150(d), UCM was aware that the initial royalty term could not exceed a period of twenty years. UCM is presumed to know the applicable law. *Messerli v. Dep't of Natural Resources*, 768 P.2d 1112, 1121 (Alaska 1989). The leases are silent about the issue of royalty adjustment,[21] but do expressly recognize that they are entered into "subject to the terms and provisions of the Alaska Land Act ... [and] to all reasonable regulations of the Commissioner of Natural Resources promulgated under the [Alaska Land] Act." Lease Nos. ADL 20633, 21545.

The absence of a lease provision for the negotiation of royalty adjustments cannot be reasonably interpreted as requiring that royalty adjustments be negotiated. Consequently, we hold that DNR's determination that its regulation providing for the adjustment of royalties when initial royalty terms expire applies to UCM's leases without negotiation is reasonable.

### E. *Back Royalties*

1. *Is DNR equitably estopped from collecting back royalties from January 1, 1989 to March 14, 1991?*

 UCM argues that DNR is equitably estopped from collecting the royalties DNR claims to be due on coal mined from January 1, 1989 to March 14, 1991 because (1) by not objecting to the royalties paid by UCM during this period, DNR thereby represented that the royalty calculation being used by

---

**21.** When a regulation promulgated after a lease has been issued conflicts with that lease, the

provisions of the lease control. 11 AAC 82.100 (1996).

UCM was correct; (2) UCM reasonably relied on this representation; and (3) UCM was prejudiced by this reliance because it cannot pass on the costs of the claimed royalties to its customers. The State responds that DNR did not take the "positive act" necessary to assert a position; that any reliance by UCM was unreasonable because delay is not itself sufficient to justify reliance; and that UCM did not suffer prejudice because DNR's October 1988 decision told UCM that any reimbursement UCM might receive from its customers was purely a matter between UCM and its customers.

▮▮▮ Whether the elements of equitable estoppel are satisfied is a question of law calling for the application of the court's independent judgment. "The general elements of equitable estoppel are (1) assertion of a position by conduct or word, (2) reasonable reliance thereon, and (3) resulting prejudice." *Mortvedt v. State,* 858 P.2d 1140, 1142 (Alaska 1993) (quoting *Municipality of Anchorage v. Schneider,* 685 P.2d 94, 97 (Alaska 1984)). A fourth element required by this court is that "the estoppel will be enforced only to the extent that justice so requires." *Id.* at 1142.

In *State, Department of Revenue v. Northern TV, Inc.,* 670 P.2d 367, 369 (Alaska 1983), the court held that the Department of Revenue was not estopped from assessing taxes based on a 1978 audit of 1971–1977 tax returns. Northern TV claimed that the agency was estopped because in a 1967 decision it had held that, due to uncertainties in the state of the law, it would for the time being forego collecting taxes on the receipts in question. *Id.* In holding that the agency was not estopped, the court concluded that the provisional nature of the agency's 1967 decision made Northern TV's reliance on the decision unreasonable. *Id.*

In the present case, UCM's royalty payments under the leases were subject to audit not only by virtue of regulation, but also by the express terms of the leases themselves. 11 AAC 85.225(d); Lease Nos. ADL 20633, 21545. The State correctly points out that "UCM was on notice that its royalty calculations were subject to review and audit under 11 AAC 85.225(d)." The lease expressly required UCM "to make copies of and extracts from such records pertaining to operations as may be required to verify compliance with the terms and conditions of this lease." Lease Nos. ADL 20633, 21545, Section 2(h)(2).

We find that it is not reasonable to conclude that payments had been audited and deemed correct by DNR in the approximately two years (1989 and 1990) in which DNR received incorrectly calculated royalty payments from UCM before notifying UCM of its error. Therefore, DNR is not equitably estopped from collecting the back royalties due for coal mined from January 1989 to March 1991. Because we conclude that UCM's reliance on DNR's failure to object to its method of calculation of royalties was not reasonable, we do not consider whether the other elements necessary for the application of equitable estoppel are present.

### F. UCM's Interpretation of "Adjusted Gross Value"

▮▮▮ UCM argues that DNR erred in deciding that payments received by UCM from its customers for federal black lung taxes, federal AML reclamation fees, state royalties, and Denali Borough severance taxes are part of the adjusted gross value of UCM's coal within the meaning of 11 AAC 85.220. The State counters that DNR's interpretation of "adjusted gross value" as used in 11 AAC 85.220 is reasonable and should be upheld.

▮▮▮ DNR's interpretation of 11 AAC 82.225 is reviewed under the reasonable basis standard. *Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992). "[W]here an agency interprets its own regulation ... a deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation at issue." *Id.* (quoting *Rose v. Commercial Fisheries Entry Comm'n,* 647 P.2d 154, 161 (Alaska 1982)).

The regulation provides:

(a) If the coal is sold in a bona fide arm's-length transaction between independent parties, adjusted gross value is the full consideration received by the lessee minus

the following costs if those costs were borne by the lessee:

(1) reasonable beneficiation costs as defined in (e)(1) of this section; and

(2) reasonable transportation costs from the mine mouth to the point of sale, as defined in (e)(2) of this section.

11 AAC 85.225 (1996).[22] DNR interprets "full consideration received" as the total payment and benefit received by UCM for the sale of the coal. This amount does not allow deductions for initial royalty, tax, and fee obligations which are later reimbursed by UCM's customers. The only deductions allowed are those for reasonable beneficiation costs and reasonable transportation costs specifically provided in the regulation. 11 AAC 85.225(a)(1)–(2) (1996).

This is a reasonable interpretation of "adjusted gross value." As the State correctly points out, "UCM is not required to collect the royalty, taxes or fees from its purchasers." If UCM was not reimbursed for these expenses, they would presumably be reflected in the sale price of the coal. Because DNR's interpretation of its regulation defining "gross value" is reasonable, it did not err in denying UCM's deductions for federal black lung taxes, federal AML reclamation fees, state royalties, and Denali Borough severance taxes, in calculating "adjusted gross value."

### G. *The Decisional Document*

#### 1. *Was DNR's decision a "regulation"?*

 UCM asserts that DNR's decision was a "regulation," as defined by AS 44.62.640(a)(3),[23] and consequently had to be issued in compliance with the rulemaking provisions of the Alaska Administrative Procedure Act (APA) to be valid. AS 38.05.020(b)(1). Because it was not issued in compliance with the APA, UCM argues that DNR's decision is invalid. The State counters that DNR's decision was not a regulation, but was a decision involving the implementation of its own regulations.

In *State v. Northern Bus Co.*, 693 P.2d 319, 320 (Alaska 1984), the Department of Education issued a directive that a school bus contract be awarded to the lowest responsive bidder. We held that this directive reflected the agency's interpretation of its applicable regulation. *Id.* at 323. We concluded that "DOE's interpretation of its own regulation does not fall within the APA's definition of 'regulation,' and therefore DOE was not required to follow APA-mandated procedures in issuing its directive to the Board." *Id.*

In this case, DNR issued a decision that UCM had erroneously calculated its "adjusted gross value," based on the definition of that term contained in 11 AAC 85.225 (1996). This decision reflects the agency's interpretation of its own validly promulgated regulation. Based on our holding in *Northern Bus*, we find that DNR's decision regarding UCM's calculation of "adjusted gross value" was not a regulation within the meaning of the APA, and that DNR was not required to

**22.** "Reasonable beneficiation costs" are "the reasonable costs of any processing performed before the sale that adds value to the coal as compared to its run-of-mine value," including activities such as washing and drying coal. 11 AAC 85.225(e)(1) (1996). "Reasonable transportation costs" are "the actual costs of transportation occurring after the coal leaves the mine mouth," including the use of tankers, trucks, and rail transportation. 11 AAC 85.225(e)(2) (1996).

**23.** AS 44.62.640(a)(3) defines "regulation" as

every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of a rule, regulation, order, or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its

procedure, except one that relates only to the internal management of a state agency; "regulation" does not include a form prescribed by a state agency or instructions relating to the use of the form, but this provision is not a limitation upon a requirement that a regulation be adopted under this chapter when one is needed to implement the law under which the form is issued; "regulation" includes "manuals," "policies," "instructions," "guides to enforcement," "interpretative bulletins," "interpretations," and the like, that have the effect of rules, orders, regulations, or standards of general application, and this and similar phraseology may not be used to avoid or circumvent this chapter; whether a regulation, regardless of name, is covered by this chapter depends in part on whether it affects the public or is used by the agency in dealing with the public.

follow the procedures of the APA in issuing its decision.[24]

### 2. Did DNR adequately document its decision?

■ UCM asserts that DNR's decision was invalid because it was not supported by a decisional document. The State counters that a formal decisional document is not required as DNR's decision is adequately documented in the record.

■ We have long held that " 'agency decisions, in exercise of their adjudicative powers, must be accompanied by written findings and a decisional document.' " *Messerli,* 768 P.2d at 1118 (quoting *Johns v. Commercial Fisheries Entry Comm'n,* 758 P.2d 1256, 1260 (Alaska 1988)). We have also strongly suggested that "non-adjudicative decisions of an agency must also be supported by an adequate decisional document." *Id.* (citing *Southeast Alaska Conservation Council v. State,* 665 P.2d 544, 549 (Alaska 1983)). However, this documentation need not occur in a formal, unified decisional document, as long as the record clearly

reflects the reasoning underlying the agency's decisions. *Id.*

In this case, DNR did not issue a formal decisional document in determining that UCM had miscalculated its "adjusted gross value." However, the communications between DNR and UCM "clearly reflect" the reasoning underlying DNR's decision. UCM was repeatedly informed that its calculations of adjusted gross value were erroneous, as they contained deductions not authorized under 11 AAC 85.225 (1996). We also find that the record reveals a "careful and reasoned administrative deliberation" by DNR in determining the meaning of "gross value" as provided in 11 AAC 82.225.[25] *Messerli,* 768 P.2d at 1118. Consequently, we hold that DNR's decision was adequately documented, and that UCM's argument regarding the lack of a decisional document is meritless.

### H. DNR's Decision Not to Forgive Back Royalties for 1989

■ Finally, UCM argues that the Commissioner should have granted it the settle-

---

**24.** UCM asserts that DNR's decision was an order or standard of general application and supplements existing regulations, and is therefore a regulation as defined by AS 44.62.640(a)(3). UCM cites *Kenai Peninsula Fisherman's Cooperative Ass'n, Inc. v. State,* 628 P.2d 897 (Alaska 1981), in support of this argument. In that case, we held that a comprehensive management policy for the Upper Cook Inlet and a related specific policy option, adopted by the Board of Fisheries, were regulations that had to be adopted in compliance with the requirements of the APA. *Id.* at 906. We found that because both "[t]he policy and the option ma[de] specific the management policies of the Board," and "served as a basis for decisions affecting commercial and recreational fishermen and were used by the Board in dealing with those groups," the policy and the option "have the effect of regulations or standards of general application.... As such, they are regulations, and should have been adopted according to APA procedures." *Id.* at 905–06. However, as we have discussed above, this case does not involve the making of policy decisions, but the implementation of policy decisions. Consequently, we find that *Kenai Peninsula Fisherman's Ass'n* is distinguishable from the case at hand.

Furthermore, DNR's decision is not, as UCM argues, a "supplement" to 11 AAC 85.225. UCM cites *State v. Tanana Valley Sportsmen's Ass'n, Inc.,* 583 P.2d 854 (Alaska 1978), in support of its argument. In that case, we held that the Alaska Board of Game's verbal instructions to agents modifying the criteria for issuing hunting permits

were "additions to regulations involving requirements of substance," and were, therefore, regulations that had to be issued in compliance with the requirements of the APA. *Id.* at 858–59. In this case, DNR's decision was not an addition to a regulation involving requirements of substance. Instead, it was the interpretation of the regulation according to its own terms. As the State correctly points out, this decision would have been transformed into a regulation only if DNR had adopted UCM's interpretation of 11 AAC 85.225, and permitted deductions other than those for beneficiation and transportation, thus revising the *definition of adjusted gross value* provided by the regulation.

**25.** The record shows that DNR's decision was given serious consideration. DNR contacted the Minerals Management Service of the Department of the Interior to inform itself of that agency's rationale for not allowing federal coal lessees to deduct or exclude the costs of the federal black lung tax, AML fees, and state land local severance taxes, from the value of coal for royalty calculation purposes. The record also shows that DNR consulted with the Department of Law to determine whether there was any legal authority for the deductions UCM took. That Department advised DNR that those deductions were not authorized by 11 AAC 85.225. Finally, DNR also considered UCM's own sales contracts in its analysis of whether the deductions were permissible.

ment initially proposed, and that DNR failed to give UCM an unbiased determination of whether it was equitable to require UCM to pay all of the claimed back royalties.[26] The State counters that the Commissioner's decision whether to settle a dispute is discretionary, and is not reviewable.

■■■■■■ All final administrative actions are presumptively reviewable. *Johns v. Commercial Fisheries Entry Comm'n,* 699 P.2d 334, 339 (Alaska 1985). However, "[w]hen a matter falls within an area traditionally recognized as within an agency's discretionary power, courts are less inclined to intrude than when the agency has acted in a novel or questionable fashion." *Vick v. Board of Elec. Examiners,* 626 P.2d 90, 93 (Alaska 1981).

Alaska Statute 38.05.140(d) provides that the Commissioner "may [grant royalty relief] ... whenever the commissioner determines that it is necessary to do so in order to promote development, or that the lease cannot be successfully operated under its terms." We hold that DNR's decision not to grant royalty relief by forgiving the royalties due for 1989 is wholly within the Commissioner's discretion, and consequently we decline to review this decision.

## IV. CONCLUSION

We find that DNR's royalty regulations at issue are valid, and that DNR's interpretation of those regulations is reasonable. We also find that UCM does not have a contractual right to have the adjusted royalty rates on its leases established by negotiation, and that DNR is not equitably estopped from collecting back royalties owed by UCM. Finally, we decline to review DNR's decision not to forgive royalties owed by UCM. Accordingly, we AFFIRM the decision of the superior court.

**26.** Specifically, UCM argues that DNR's decision was based on the advice of the Department of Law that UCM was required to pay all of the royalties owed as a result of the State's fiduciary responsibility under the Mental Health Settlement. UCM asserts "DNR should have made its decision on the forgiveness issue based on the facts and the tests for equitable estoppel. When an agency gives the wrong reason for a decision, the reviewing court must send the case back for a new determination, even if the agency could have used correct reasoning to reach the same result." (Citing 1 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 8.5, at 392–94 (3d ed. 1994).)