*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, DEPARTMENT OF FISH & GAME, and COMMISSIONER DOUGLAS VINCENT-LANG, in an official capacity, | ) ) ) ) ) | Supreme Court No. S-19006<br><br>Superior Court No. 3AN-21-05627 CI |
| Appellants, | ) ) | O P I N I O N |
| v. | ) ) | No. 7788 – September 26, 2025 |
| COOK INLETKEEPER, KACHEMAK BAY CONSERVATION SOCIETY, THE ALASKA QUIET RIGHTS COALITION, and FRIENDS OF KACHEMAK BAY STATE PARK, | ) ) ) ) ) ) | |
| Appellees. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Adolf V. Zeman, Judge.

Appearances: Laura E. Wolff, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellants. Scott M. Kendall, Samuel G. Gottstein, and Jahna M. Lindemuth, Cashion Gilmore & Lindemuth, Anchorage, for Appellees.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

PATE, Justice.

# I. INTRODUCTION

The legislature has afforded fish, wildlife, and their habitat special protections within statutorily defined Critical Habitat Areas (CHAs). These protections generally take the form of restrictions on how the areas may be used, and the legislature has tasked the Board of Fisheries, the Board of Game, (collectively the Boards) and the Commissioner of the Alaska Department of Fish and Game (ADF&G) with implementing these restrictions.

The Commissioner adopted a regulation banning the use of personal watercraft, popularly known as jet skis, in two CHAs. Years later the Commissioner repealed that ban through the rulemaking process. Conservation groups challenged the repeal, arguing that it was inconsistent with the governing statutes and unsupported by scientific evidence. On cross-motions for summary judgment, the superior court granted relief to the conservation groups and denied relief to the State, reasoning that the repeal conflicted with the purpose of the CHA statutes. It reinstated the regulation banning jet skis and awarded attorney's fees and costs to the groups.

We hold that the Commissioner had the authority to repeal the regulation through the rulemaking process, and the repeal was valid. Accordingly, we reverse the decision of the superior court. We remand with directions to enter summary judgment in favor of the State and for a new determination of prevailing party status and award of attorney's fees.

# II. FACTS AND PROCEEDINGS

## A. Facts

The legislature enacted the CHA statutes in 1972 "to protect and preserve habitat areas especially crucial to the perpetuation of fish and wildlife, and to restrict all other uses not compatible with that primary purpose."[1] In furtherance of this purpose, the statutes established an approval process, administered by the Board of

---

[1] Ch. 140, § 2, SLA 1972 (current version at AS 16.20.500).

Fisheries, the Board of Game, and the Commissioner, for deciding the range of permissible uses within CHAs;[2] the Commissioner was given the authority to review and approve plans for such uses.[3] Concurrent with the statutes' enactment, the legislature established several CHAs, including the Fox River Flats CHA.[4] Two years later, it established the Kachemak Bay CHA.[5] Subsequently, the Boards and Commissioner jointly promulgated regulations implementing the statutory approval process via a permitting system.[6]

With the help of various federal and state agencies, including the Department of Natural Resources (DNR),[7] ADF&G established the Fox River Flats and Kachemak Bay Critical Habitat Areas Management Plan in 1993.[8] The management plan laid out several policies related to uses in both CHAs, and it established two overarching goals: (1) to maintain and enhance fish and wildlife populations and habitat, and (2) to maintain and enhance public use of fish and wildlife and lands within the CHAs.[9]

In 2000 ADF&G initiated a scientific literature review to consider whether jet skis should be banned in the Kachemak Bay and Fox River Flats CHAs. The

---

[2]     *See id.* (current version at AS 16.20.520-.530). The legislature also delegated power to the Boards to "adopt regulations they consider advisable for conservation and protection purposes governing the taking of fish and game." *Id.* (current version at AS 16.20.510).

[3]     *Id.* (current version at AS 16.20.530(b)).

[4]     *Id.* (current version at AS 16.20.580).

[5]     *Id.* (current version at AS 16.20.590).

[6]     5 Alaska Administrative Code (AAC) 95.400-.440, .700-.770.

[7]     DNR and ADF&G have overlapping jurisdiction in Kachemak Bay.

[8]     *See* ADF&G, KACHEMAK BAY AND FOX RIVER FLATS CRITICAL HABITAT AREAS MANAGEMENT PLAN (1993). The management plan's goals and policies are incorporated by reference in 5 AAC 95.610.

[9]     *See* ADF&G, *supra* note 8, at 5-6.

literature review concluded jet skis did "not appear to be inherently more disruptive to wildlife or more polluting than other 2-stroke marine engines," but "characteristics of their use," including "higher noise levels, faster speeds, erratic movements, [their] ability to enter shallower water, and their [users'] tendency to operate in groups," suggested that jet skis had a more significant impact on wildlife than conventional watercraft. The Commissioner subsequently promulgated 5 AAC 95.310,[10] which banned the use of jet skis in both CHAs. The Commissioner cited his duty to manage and protect fish and game resources[11] and the CHA statutes' purpose of protecting and preserving crucial habitat[12] as statutory authority for the regulation.[13]

---

[10] The regulation provides that:

(a) A person may not operate a personal watercraft within the following legislatively designated areas:

(1) Fox River Flats Critical Habitat Area established in AS 16.05.580;

(2) Kachemak Bay Critical Habitat Area established in AS 16.05.590.

(b) In this section, "personal watercraft" means a vessel that is

(1) less than 16 feet in length;

(2) propelled by a water-jet pump or other machinery as its primary source of motor propulsion; and

(3) designed to be operated by a person sitting, standing, or kneeling on the vessel, rather than by a person sitting or standing inside it.

[11] AS 16.05.020.

[12] AS 16.20.500.

[13] The notice of the proposed regulation also cited AS 41.21.020 as authority for the regulation, which gives DNR power to enact "regulations governing the use and designating incompatible uses within the boundaries of state park and recreational areas to protect the property and to preserve the peace."

ADF&G revisited the regulatory ban in 2017 and conducted another scientific literature review, which noted that studies on jet ski impacts were "not specific to northern latitude marine waters" and that technological improvements had mitigated noise and pollution issues associated with jet skis. However, the review noted that concerns remained about jet skis entering shallow water, associated noise, user group conflicts, and other user behaviors. Therefore, it concluded that there was "no new information that would warrant rescinding the prohibition."

Two years later, ADF&G changed its position. Acting on a directive from the governor's office to identify "overburdensome, unnecessary regulations hampering Alaska businesses or Alaskans from enjoying Alaska,"[14] ADF&G identified the ban on jet skis in the Kachemak Bay and Fox River Flats CHAs as one such regulation. The Commissioner and the governor's office decided to initiate the repeal of 5 AAC 95.310 through the rulemaking process.

As a part of that process, the Commissioner fielded public inquiries and comments regarding the proposed change, spoke with staff, and considered existing literature reviews of scientific studies. The Commissioner also consulted with DNR about the proposed repeal. Ultimately, the Commissioner decided to repeal the ban, explaining in a decisional document that allowing jet ski use in the Kachemak Bay and Fox River Flats CHAs was consistent with protecting and preserving crucial habitat. The document noted that the scientific research previously relied upon for enacting the ban was inconclusive and had not studied the impacts of jet skis in northern marine environments comparable to Kachemak Bay. Further, it recognized that technological improvements, specifically four-stroke engines, had made jet skis quieter and cleaner. And although concerns about jet skis entering shallow water and traveling at high speeds remained, the decisional document observed that other watercraft with similar

---

[14] The record indicates that state agencies generally conduct a regulatory review every three years.

capabilities and impacts were allowed in the CHAs. Therefore, the Commissioner determined that the regulation banning jet skis was "overburdensome," and repealing the prohibition was "justified."

The Commissioner issued a notice of the repeal that cited AS 16.05.020 and AS 16.20.500 as authority for the action. The repeal became effective in January 2021.

## B. Proceedings

In May 2021 Cook Inletkeeper, Kachemak Bay Conservation Society, the Alaska Quiet Rights Coalition, and Friends of Kachemak Bay State Park (collectively Inletkeeper) sued ADF&G and the Commissioner (collectively the State), asserting that the repeal of 5 AAC 95.310 was invalid. Inletkeeper claimed that the Commissioner lacked statutory authority to repeal the prohibition and that the repeal was inconsistent with the statutory purpose of CHAs. Inletkeeper also argued that the repeal violated the Administrative Procedure Act because it was (1) a predetermined outcome, (2) arbitrary and ignored scientific data, and (3) inconsistent with other regulations.[15] Both parties moved for summary judgment.

The superior court granted summary judgment for Inletkeeper, concluding that the Commissioner did not have express or implied statutory authority to repeal the prohibition and, alternatively, that the repeal was inconsistent with the CHA statutes. The court determined that AS 16.05.020, the Commissioner's enabling statute, did not imply rulemaking authority, and that the Commissioner was authorized to implement the CHA statutes only through the permitting process. Applying its independent judgment, the court held that the repeal was inconsistent with the purpose of AS 16.20.500, "which repeatedly directs the Department . . . 'to restrict all other uses

---

[15]     Inletkeeper also alleged the Commissioner "unconstitutionally prioritized the rights of [jet ski] users over all other Alaskans." However, we do not further address this argument because Inletkeeper does not brief it on appeal.

not compatible' with protecting and preserving the CHAs' fish and wildlife." Because the court determined the repeal was outside the Commissioner's authority, it did not reach Inletkeeper's other claims.

The State moved for reconsideration, which the superior court denied. Despite the denial, the court suggested that the Commissioner could have shown the repeal was within the Commissioner's statutory authority if it "had reasonably stated that [jet skis] will not negatively impact fish and wildlife within the CHAs." The court also stated that the Commissioner "provided no explanation or evidence about how repealing the prohibition of [jet ski] use within the CHAs would" advance the CHAs' purpose, and that the Commissioner's "decision to repeal the regulation was not reasonable such that the Court should have afforded the Department's decision to repeal the [jet ski] regulation more deference."

After denying the State's motion, the superior court issued a final judgment reinstating the prohibition, requiring notice of the reinstatement, and declaring Inletkeeper the prevailing party. The court subsequently granted a stay pending appeal regarding enforcement of the notice requirement, but declined to stay its order reinstating the prohibition. The court later awarded Inletkeeper attorney's fees and costs.

The State appeals.

## III. STANDARD OF REVIEW

We review a decision to grant summary judgment de novo and will affirm "if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law."[16] "A material fact is one upon which resolution of an

---

[16] *Fischer v. Kenai Peninsula Borough Sch. Dist.*, 548 P.3d 1086, 1091 (Alaska 2024) (quoting *Sulzbach v. City & Borough of Sitka*, 517 P.3d 7, 13 (Alaska 2022)) (internal quotation marks omitted); *see also* Alaska R. Civ. P. 56(c).

issue turns."[17]   In reviewing a grant of summary judgment, we draw all reasonable inferences in favor of the nonmoving party.[18]

We apply our independent judgment to determine whether an agency has rulemaking authority.[19]   We apply one of two standards to review an agency's interpretation of a statute.[20]   Under the reasonable basis standard, "we give deference to the agency's interpretation so long as it is reasonable, when the interpretation at issue implicates agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions."[21]   "[W]here the agency's specialized knowledge and experience would not be particularly probative on the meaning of the statute," we apply our independent judgment.[22]   "Even under the independent judgment standard, however, the court gives some weight to what the agency has done, especially where the agency interpretation is longstanding."[23]

## IV.   DISCUSSION

The primary purpose of CHAs is the conservation of fish, wildlife, and their habitat and to "restrict all other uses not compatible with that primary purpose."[24]

---

[17]   *Fischer*, 548 P.3d at 1091 (quoting *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 519 (Alaska 2014)).

[18]   *Christensen*, 335 P.3d at 520.

[19]   *O'Callaghan v. Rue*, 996 P.2d 88, 94 (Alaska 2000).

[20]   *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011).

[21]   *Id.* (citing *Matanuska-Susitna Borough v. Hammond*, 726 P.2d 166, 175 (Alaska 1986)).

[22]   *Hammond*, 726 P.2d at 175 (citing *Nat'l Bank of Alaska v. State, Dep't of Revenue*, 642 P.2d 811, 815 (Alaska 1982)).

[23]   *Usibelli Coal Mine, Inc. v. State, Dep't of Nat. Res.*, 921 P.2d 1134, 1142-43 (Alaska 1996) (quoting *Fairbanks N. Star Borough Sch. Dist. v. NEA-Alaska, Inc.*, 817 P.2d 923, 925 (Alaska 1991)) (internal quotation marks omitted).

[24]   AS 16.20.500.

To that end, the Kachemak Bay and Fox River Flats management plan goals and policies, which were enacted by regulation,[25] provide a number of substantive protections. For example, mineral leasing, coal leasing, and most surface entry for oil and gas exploration and development are prohibited in both CHAs.[26] Yet many other activities *are* allowed. Private landowners can build docks, piers, and boat ramps to access their parcels in both CHAs.[27] Grazing leases for cattle and horses are allowed in Fox River Flats.[28] And while "[t]raversing areas with rooted vegetation in airboats or hovercraft is prohibited,"[29] the regulations do not otherwise prohibit the use of powerboats in either CHA.[30] In other words, the protections are less than absolute and "accommodate a variety of critical habitat area users."[31]

At its core, the parties' dispute requires us to decide the extent of the Commissioner's regulatory authority to determine whether specific uses are compatible with the primary purpose of the CHAs. Both the State and Inletkeeper agree on appeal that the Commissioner had the regulatory authority to enact 5 AAC 95.310, which was the original jet ski ban. But Inletkeeper asserts that the repeal of 5 AAC 95.310 conflicts with the conservation purpose stated in AS 16.20.500 and, as a result, falls outside the Commissioner's regulatory authority. Additionally, Inletkeeper argues that the repeal is arbitrary and "inconsistent with existing regulations." The State responds that Inletkeeper's reading of AS 16.20.500 is too strict. Instead, the State says ADF&G has long interpreted AS 16.20.500 to restrict only uses with significant adverse effects

---

[25]     5 AAC 95.610.

[26]     *See* ADF&G, *supra* note 8, at 11 (stating plan policies).

[27]     *Id.* at 8.

[28]     *Id.* at 10.

[29]     *Id.* at 7.

[30]     *See id.* at 5-11.

[31]     *Id.* at 7.

on habitat, and the repeal is consistent with that interpretation. Finally, the State argues that the repeal was reasonable and not in conflict with other laws.

Our review of a regulatory action centers on the enabling statute. The preliminary inquiry is whether the agency, "by express or implied terms of a statute," has rulemaking authority, and whether "the legislature has intended to commit to the agency discretion as to the particular matter that forms the subject of the regulation."[32] Once this preliminary inquiry is satisfied, we ask (1) whether the regulation "is consistent with and reasonably necessary to carry out the purposes of the enabling statutes, (2) whether it is reasonable, (3) and whether it directly conflicts with any other state statute."[33] To be valid, a regulation must meet all of these criteria.[34] But we begin with a presumption that an administrative rule is valid, and "the challenger bears the burden of proving it is invalid."[35]

We conclude that the Commissioner had the regulatory authority to enact 5 AAC 95.310, and this authority necessarily includes the authority to repeal 5 AAC 95.310. Further, the substance of and justification for the repeal are consistent

---

[32] *Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971) (quoting AS 44.62.030).

[33] *State v. Anderson*, 749 P.2d 1342, 1344 (Alaska 1988) (citing *Kelly*, 486 P.2d at 911).

[34] *See Rubey v. Alaska Comm'n on Postsecondary Educ.*, 217 P.3d 413, 417 n.16 (Alaska 2009) ("The validity of a regulation depends on the regulation being (1) consistent with and reasonably necessary to carry out the purpose of the authorizing statute, and (2) reasonable and not arbitrary." (citing *Kelly*, 486 P.2d at 911)); *Sagoonick v. State*, 503 P.3d 777, 804 (Alaska 2022) (noting that regulation is invalid if inconsistent with its enabling statute or if in conflict with other statutes (citing *Manning v. State, Dep't of Fish & Game*, 355 P.3d 530, 534 (Alaska 2015))); *see also* AS 44.62.020-.030.

[35] *O'Callaghan v. Rue*, 996 P.2d 88, 95 (Alaska 2000) (citing *State, Dep't of Revenue v. Cosio*, 858 P.2d 621, 624 (Alaska 1993)).

with the purpose of the CHA statutes. Finally, we determine that the repeal was reasonable and not arbitrary, and the repeal did not conflict with other laws.

**A.    The Commissioner Had The Regulatory Authority To Enact And To Repeal 5 AAC 95.310.**

At the outset we note that some aspects of the parties' dispute about the source and scope of the Commissioner's regulatory authority are poorly defined. This ambiguity is also apparent in the superior court's rulings. The court initially ruled that the Commissioner "[did] not have either express or implied statutory authority to repeal 5 AAC 95.310."[36] But in denying the State's motion for reconsideration, the court stated that it "did not find that there was no permissible approach to" repealing 5 AAC 95.310. These two rulings are in conflict because one suggests the existence of regulatory authority, and the other denies it. And Inletkeeper appears to take both positions, arguing that the superior court correctly found the Commissioner lacked rulemaking authority while also conceding that the Commissioner has some such authority.

Accordingly, we first address the sources of the Commissioner's regulatory authority. We conclude that the Commissioner's authority to enact 5 AAC 95.310 comes from two sources: (1) the Commissioner's implied statutory authority to approve uses within CHAs, and (2) the Boards' authority, which they have delegated to the Commissioner, to determine whether uses are subject to permitting requirements. Further, the authority to promulgate 5 AAC 95.310 implies the authority to repeal it.

---

[36]     The superior court's initial view was that nothing in the legislative history of the CHA statutes "indicate[s] that the legislature intended to give the Commissioner authority to adopt standalone regulations for conservation and protection purposes within CHAs."

### 1. The Commissioner had the authority to enact 5 AAC 95.310.

Because the repeal in this case involved an existing rule promulgated by the Commissioner, the original ban is the natural starting point for assessing the Commissioner's authority to repeal it. Accordingly, we first consider whether the legislature intended to commit to the Commissioner the discretion to decide the range of permissible uses within CHAs.[37] The superior court initially concluded that although the Commissioner has permitting authority in CHAs, he has no authority "to adopt standalone regulations for conservation and protection purposes within CHAs." We disagree and hold that the Commissioner did have the authority to enact 5 AAC 95.310. Further, that authority is a mixture of implied statutory authority and authority delegated from the Boards.

#### a. The Commissioner's implied statutory authority

An agency's authority to adopt regulations implementing or interpreting a statute may be express or implied.[38] Express authority generally flows from an explicit grant of rulemaking authority in the enabling statute.[39] Implied authority generally involves a broad grant of rulemaking authority and then a more specific directive to implement a statute that falls within the ambit of the broader authority.[40] While the

---

[37] *See Kelly*, 486 P.2d at 911 (holding that courts should assess rule's consistency with enabling statute after determining whether "legislature has intended" to commit subject matter of rule to agency's discretion); *Warner v. State, Dep't of Com. & Econ. Dev., Real Est. Comm'n*, 819 P.2d 28, 31 (Alaska 1991) ("[T]he first inquiry under the APA and *Kelly* is whether the legislature intended to commit the question of a surety fund claim deadline to the discretion of the Commission.").

[38] *Warner*, 819 P.2d at 31 (citing AS 44.62.030).

[39] *See, e.g.*, *Kelly*, 486 P.2d at 912 (noting statute directed DNR Commissioner to "establish reasonable procedures and adopt reasonable rules and regulations necessary to carry out" statute (quoting AS 38.05.020(b)(1))).

[40] *See, e.g.*, *Chevron U.S.A., Inc. v. LeResche*, 663 P.2d 923, 927-28 (Alaska 1983) (holding that statute allowing agency to request geophysical data from oil and

specific directive may or may not delegate rulemaking authority, such authority can be implied by reading statutes together.[41]

The CHA statutes do not contain an express grant of rulemaking authority to the Commissioner.[42] But both the State and Inletkeeper agree, at times, that the Commissioner has some level of implied regulatory authority within CHAs. And to the extent that they agree, they posit that this authority is derived, in part, from the Commissioner's statutory authority to manage and protect fish and wildlife resources.[43]

The State asserts that this statutory authority, combined with the Commissioner's statutory authority to approve certain uses within CHAs,[44] gives the Commissioner implied regulatory authority to determine which uses are permissible within CHAs. In contrast, Inletkeeper asserts that the Commissioner's regulatory authority in CHAs flows solely from the broad authority to manage and protect fish and wildlife, and that authority is cabined by the conservation purpose outlined in AS 16.20.500. As a result, Inletkeeper reasons the Commissioner's regulatory authority in CHAs is limited "to protect[ing] critical habitat 'especially crucial to the

---

gas lessees, combined with broad rulemaking authority to administer Alaska Land Act, implied authority to make rules requiring submission of such data).

[41]    *See id.*; *Usibelli Coal Mine, Inc. v. State, Dep't of Nat. Res.*, 921 P.2d 1134, 1143-44 (Alaska 1996) (holding that "broad grant of rulemaking authority" in Alaska Land Act and authority to make rules "for the disposition of coal deposits" implied authority to make rules setting coal royalty rates).

[42]    There is one express grant of authority in AS 16.20.510, which directs the Boards to "adopt regulations they consider advisable for conservation and protection purposes governing the taking of fish and game" in CHAs.

[43]    AS 16.05.020(2)-(3).

[44]    *See* AS 16.20.530(b).

perpetuation of fish and wildlife.' "[45]  We think the State's view is more consistent with the statutory scheme.

Our decision in *O'Callaghan v. Rue*[46] is instructive.  In *O'Callaghan*, we held that the Commissioner had implied regulatory authority to authorize salmon-roe stripping based on two statutes.[47]  First, we noted that the Commissioner's "necessary powers" under AS 16.05.020 to "manage, protect, maintain, improve, and extend" Alaska's fish and game resources provide a broad backdrop of regulatory authority.[48]  And second, we identified a specific directive in Alaska's salmon waste statute that allowed the Commissioner "to authorize . . . other uses of salmon that would be consistent with maximum and wise use of the resource."[49]  Although the latter provision did not explicitly confer rulemaking authority on the Commissioner, we noted that regulating salmon use fell within the ambit of the Commissioner's "general authority to manage fishery resources."[50]  And "[t]ogether," the two provisions "delegate[d]

---

[45]     *See* AS 16.20.500.  Inletkeeper also asserts that, because AS 16.20.510 grants the Boards authority to regulate hunting and fishing, the Commissioner may not promulgate regulations that address the taking of fish and game.  We do not address this interpretation, however, because the regulatory action at issue here does not involve hunting or fishing.

[46]     996 P.2d 88 (Alaska 2000).

[47]     *Id.* at 95.

[48]     *Id.* (noting Commissioner's "general authority to manage fishery resources").

[49]     *Id.* (quoting AS 16.05.831(b)).

[50]     *Id.* at 95.  We did note, however, that the salmon waste statute expressly contemplated the Commissioner's regulatory authority by providing civil and criminal penalties for violations of "a regulation adopted under" the statute. *Id.* (quoting AS 16.05.831(c)).  But because the statute itself did not clearly grant the Commissioner rulemaking authority, we found both statutes necessary to authorize the regulation in question. *See id.* at 95-96.

rulemaking authority to the Commissioner" to promulgate the roe-stripping regulation.[51]

Here, the Commissioner's broad authority to "manage, protect, maintain, improve, and extend the fish, game and aquatic plant resources"[52] provides a broad backdrop of regulatory authority. And by giving the Commissioner the power to approve "plans and specifications" for compatible uses within CHAs, AS 16.20.530(b) provides the specific statutory directive to "enforce and interpret" the CHA statutes' approval system.[53] Further, protecting habitat "crucial to the perpetuation of fish and wildlife" pursuant to AS 16.20.500 falls within the Commissioner's broad authority under AS 16.05.020 to protect and improve state fish and game resources. Thus, like *O'Callaghan*, the combination of the Commissioner's broad statutory authority and the more specific directive to implement the CHA statutes gives the Commissioner implied regulatory authority to approve certain uses as compatible with the CHA statutes' conservation purpose.[54]

### b. The Boards' delegated authority

Alaska Statute 16.20.530 confers on the Commissioner the authority to provide "written approval . . . as to the sufficiency of the plans and specifications" of

---

[51]  *Id.*

[52]  AS 16.05.020.

[53]  *See O'Callaghan*, 996 P.2d at 95.

[54]  This interpretation aligns with past Attorney General opinions, which "are entitled to some deference." *State v. Dupier*, 118 P.3d 1039, 1050 n.62 (Alaska 2005). For example, in a 1982 opinion, the Attorney General concluded that the Commissioner and Boards "ha[ve] the authority to adopt regulations implementing . . . permit programs" in special areas, including CHAs. *See* 1982 FORMAL OP. ATT'Y GEN. 1, 9-12. This authority was implied from the Commissioner's authority to manage and protect fish and game resources, and the specific permitting authority in Alaska's special areas statutes. *See id.* (describing authority to implement permitting in anadromous stream statute); *see also id.* at 8 n.4 (noting CHA statutes and anadromous stream statutes "use the same 'notification' and 'plans and specifications' language").

an "anticipated use" within CHAs. But AS 16.20.530(a) also gives the Boards the authority to determine whether any plans and specifications must be submitted to the Commissioner in the first instance.[55] In light of the purpose of AS 16.20.500 "to restrict all other uses not compatible with" protecting critical habitat, the Boards necessarily have the authority to determine the uses that are presumptively incompatible, and thus require the Commissioner's approval before any such use may occur within the CHAs.

The enactment of 5 AAC 95.310 implicates this division of authority between the Commissioner and the Boards. The regulation has two substantive components. First, it includes a determination that jet skis are presumptively incompatible with the CHA statutes' conservation purpose and thus subject to regulatory control. And second, it includes a blanket disapproval of jet skis as incompatible with habitat protection. Although the latter falls within the Commissioner's implied regulatory authority, the former falls within the Boards' authority.

As noted above, AS 16.20.530(a) gives the Boards the authority to determine which uses are presumptively incompatible and thus subject to regulatory control. However, we conclude that the Boards have effectively delegated this authority to the Commissioner.[56] Our conclusion is based on 5 AAC 95.400-.440, which the Boards and Commissioner jointly promulgated to implement AS 16.20.520-.530.[57] These regulations direct the Commissioner to "implement the authorities vested in" AS 16.20.520 and .530, "excluding hunting, trapping and fishing,"[58] and provide that

---

[55]     *See* AS 16.20.530(a) ("When a board determines that the following information is required, it shall instruct the commissioner . . . to require the person or governmental agency to submit" plans and/or specifications.).

[56]     *See* AS 16.05.270 (providing that Boards "may delegate" their regulatory authority to Commissioner).

[57]     *See* 5 AAC 95.400.

[58]     *Id.*

the Commissioner "makes the final determination as to whether a specific activity is subject to" permitting requirements in CHAs.[59]   Because these regulations were promulgated in part by the Boards, they effect a delegation to the Commissioner of the authority the Boards have under AS 16.20.530(a) to determine whether a type of use is presumptively incompatible with habitat conservation.   The enactment of 5 AAC 95.310 was thus within the Commissioner's authority to determine what uses are subject to permitting requirements and his authority to approve or disapprove those uses.

### 2. The Commissioner's authority to enact 5 AAC 95.310 implies the authority to repeal it.

Having established that it was within the Commissioner's authority to enact 5 AAC 95.310, it necessarily follows that the repeal of 5 AAC 95.310 was also within the Commissioner's authority.   As other state and federal courts have noted, agencies generally have the authority to amend or repeal their own regulations.[60]   That authority is implied from the agency's authority to promulgate rules in the first

---

[59]   5 AAC 95.420(b); *see also* 5 AAC 95.420(a)(10) (requiring permit for "any other activity that is likely to have a significant effect on . . . fish, wildlife, or their habitat, or which disturbs fish or wildlife other than lawful hunting, trapping, fishing, viewing, and photography").

[60]   *See County of Hudson v. Dep't of Corr.*, 703 A.2d 268, 274 (N.J. 1997) ("In general, an agency has the authority to amend, change, or repeal its regulations, especially in response to changing conditions."); *Ins. Fed'n of Pa., Inc. v. Commonwealth, Ins. Dep't*, 970 A.2d 1108, 1124 (Pa. 2009) ("[A]n agency may revise its policies and amend its regulations in interpreting its statutory mandate." (quoting *Elite Indus., Inc. v. Pa. Pub. Util. Comm'n*, 832 A.2d 428, 431-32 (Pa. 2003))); *Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 810-11 (5th Cir. 2024) ("An administrative agency may alter or rescind its policies, including when a new administration enters office."); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42 (1983) (noting that agencies "must be given ample latitude to 'adapt their rules and policies to the demands of changing circumstances' " (quoting *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 784 (1968))).

instance.[61]  "An administrative agency does not exhaust its power to make rules and regulations by having made a particular enactment."[62]  Holding otherwise would spawn zombie regulations, unslayable once promulgated, no matter the passage of time or change in circumstances.

The superior court initially held that the Commissioner "does not have either express or implied statutory authority to repeal 5 AAC 95.310."  This was error.  The existence of the Commissioner's statutory authority to enact 5 AAC 95.310 implies the authority to repeal it.  Inletkeeper attempts to recast the superior court's holding as addressing the repeal's consistency with the CHA statutes' purpose, but Inletkeeper conflates the existence of regulatory authority with the issue of whether the authority was exercised in a manner consistent with the enabling statute.  And although we have described the latter inquiry as asking "whether the regulation is within the scope of authority conferred on" the agency,[63] a regulation's consistency with an enabling statute presupposes the existence of regulatory authority.

In conclusion, we hold that the Commissioner has the power to promulgate regulations that declare "whether a specific activity is subject to the provisions of" AS 16.20.530.[64]  This power stems from the Commissioner's implied

---

[61]  *See, e.g.*, *Dep't of Transp., Motor Vehicle Admin. v. Armacost*, 474 A.2d 191, 207 (Md. App. 1984) ("[W]e think it implicit that the authority to adopt rules carries with it the power to amend the rules so adopted.  In other words, an agency with expressly granted rulemaking powers has implied authority to alter, amend and repeal the regulations it has adopted."); *see also* 73 C.J.S. *Public Administrative Law and Procedure* § 258 (2025) ("An administrative agency may repeal or revoke its rules and regulations, as a matter of discretion, provided that such action is not arbitrary or unreasonable." (citations omitted)).

[62]  *Int'l Union of C.R. & Soc. Serv. Emps. v. Mich. Civ. Serv. Comm'n*, 226 N.W.2d 550, 552 (Mich. App. 1975).

[63]  *State v. Anderson*, 749 P.2d 1342, 1344 (Alaska 1988).

[64]  *See* 5 AAC 95.420(b).

regulatory authority under AS 16.05.020 and AS 16.20.530(b), and from the Boards' authority under AS 16.20.530(a), which the Boards have delegated to the Commissioner through 5 AAC 95.420(b). Further, the Commissioner's authority to adopt 5 AAC 95.310 implies the authority to repeal it.

**B.    The Repeal Of 5 AAC 95.310 Was Consistent With The CHA Statutes.**

Once we are satisfied that the legislature "has intended to commit to the agency discretion as to the particular matter that forms the subject of the regulation," we consider "whether the regulation is consistent with and reasonably necessary to carry out the purposes of the" statute.[65] This inquiry asks whether the regulation "bears a reasonable relationship to the statutory objective,"[66] "whether the [agency] exceeded its statutory mandate in promulgating the regulation, either by pursuing impermissible objectives or by employing means outside its powers,"[67] and whether the rule is "fundamentally inconsistent with the legislative intent underlying the controlling statute."[68]

We conclude that the repeal is consistent with the CHA statutes' purpose of protecting critical habitat. The broad language in AS 16.20.500 indicates that the legislature intended to grant the Boards and Commissioner significant discretion in determining what uses are compatible with that primary purpose, and that it intended to allow some uses that have adverse impacts on habitat. Further, the CHA statutes' limited legislative history does not conflict with our reading.

---

[65]    *Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971).

[66]    *Vail v. Coffman Eng'rs, Inc.*, 778 P.2d 211, 214 (Alaska 1989) (citing *State v. Alyeska Pipeline Serv. Co.*, 723 P.2d 76, 78 (Alaska 1986)).

[67]    *Grunert v. State*, 109 P.3d 924, 929 (Alaska 2005) (quoting *Meier v. State, Bd. of Fisheries*, 739 P.2d 172, 173 (Alaska 1987)) (internal quotation marks omitted).

[68]    *Id.* at 932 (citing *Madison v. Alaska Dep't of Fish & Game*, 696 P.2d 168, 178 (Alaska 1985)).

### 1. The CHA statutes' text

The statutes at issue here have a clear purpose: "to protect and preserve habitat areas especially crucial to the perpetuation of fish and wildlife, and to restrict all other uses not compatible with that primary purpose."[69]  The superior court interpreted this provision as a strict limitation on the Commissioner's regulatory authority, concluding that because the statute emphasizes a conservation purpose and "restricting" uses, the repeal of 5 AAC 95.310 was fundamentally inconsistent with the purpose of AS 16.20.500.

Inletkeeper argues for a similarly strict reading of AS 16.20.500.  It asserts that the repeal was inconsistent with the directive to "restrict all uses not compatible with" habitat protection "because there is no evidence that the repeal protects and preserves fish and wildlife habitat."  But the State asserts that Inletkeeper's strict reading of AS 16.20.500 is unsupported by the statutory scheme.  It points out that the legislature expressly allowed uses like oil and gas leasing in some CHAs,[70] uses that clearly run afoul of Inletkeeper's interpretation of AS 16.20.500.[71]

We agree with Inletkeeper that the overriding purpose of the CHA statutes is the protection of fish, wildlife, and their habitat.  Not only is this purpose unequivocally stated in AS 16.20.500, but it also aligns with the approval scheme

---

[69]     AS 16.20.500.

[70]     *See, e.g.*, AS 16.20.605(c) (providing that "[f]uture conveyances, including . . . oil and gas leases, may occur" in Anchor River and Fritz Creek CHA); AS 16.20.615(e) (providing that ADF&G "shall permit entry within the Tugidak Island Critical Habitat Area for the exploration and development of oil and gas resources when compatible with the purposes for which the critical habitat area was established").

[71]     The State also asks us to defer to its interpretation of "compatibility" because it implicates "both agency expertise and fundamental policies within the agency's authority."  However, we need not reach the State's argument because, as discussed below, we find that the repeal is clearly consistent with AS 16.20.500 under either standard of review.

established by AS 16.20.520-.530, which gives the Boards and Commissioner special authority in deciding the range of permissible uses within CHAs.[72]  But we cannot agree that the means to that end is a flat prohibition on any use that may have an adverse effect on habitat.  Such a strict reading is not supported by the text of AS 16.20.500 or the statutory scheme as a whole.

It is significant that the legislature left "compatibility" undefined.[73]  Webster's New World Dictionary defines compatible as "capable of living together harmoniously or getting along well together; in agreement; congruous."[74]  In other words, "compatibility" is a broad concept that includes a balancing of relationships of varying degrees of congruity.  Given the Boards' regulatory authority over habitat conservation,[75] and the Commissioner's duty to manage and protect fish and wildlife resources,[76] we think "[t]he only reasonable construction that can be placed on the statute" is that the legislature, in choosing such broad language, intended the Boards and Commissioner to have significant discretion in determining which uses are compatible with the primary conservation purpose of CHAs.[77]

---

**72**    *See Guerin v. State*, 537 P.3d 770, 778 (Alaska 2023) ("[W]hen a statute . . . is part of a larger framework or regulatory scheme, [it] must be interpreted in light of the other portions of the regulatory whole." (second alteration in original) (quoting *Alaska Ass'n of Naturopathic Physicians v. State, Dep't of Com., Cmty. & Econ. Dev.*, 414 P.3d 630, 636 (Alaska 2018)) (internal quotation marks omitted)).

**73**    *See* AS 16.20.500-.690.

**74**    *Compatible*, WEBSTER'S NEW WORLD DICTIONARY OF THE ENGLISH LANGUAGE (2d coll. ed. 1980); *see also Compatible*, FUNK & WAGNALLS STANDARD DESK DICTIONARY (4th ed. 1977) (defining compatible as "[c]apable of existing together; congruous; congenial").

**75**    *See* AS 16.05.251(a)(7), .255(a)(7).

**76**    *See* AS 16.05.020.

**77**    *See Kelly v. Zamarello*, 486 P.2d 906, 912 (Alaska 1971).

Inletkeeper's argument includes an inference that we should read "compatibility" as foreclosing uses that have any adverse effect on fish and wildlife habitat. In fact, Inletkeeper asserts that *any* regulatory action under AS 16.20.500 must "protect[] and preserve[] fish and wildlife habitat." But this presumes a strict reading of compatibility that is not supported by the CHA statutes. For example, the CHA statutes contemplate hunting, fishing, and "construction work,"[78] all of which could conceivably have some adverse effects on habitat. Similarly, AS 16.20.615(e) allows "the exploration and development of oil and gas resources" in the Tugidak Island CHA "when compatible with the purposes for which the [CHA] was established." Given that the primary purpose of the CHA scheme is the protection of "habitat areas especially crucial to the perpetuation of fish and wildlife," AS 16.20.615(e) reflects a legislative determination that oil and gas exploration and development can, in some circumstances, be compatible with that purpose.[79] Accordingly, the legislature clearly decided that some uses with adverse effects on habitat would be permissible in CHAs.

Inletkeeper also faults the Commissioner for justifying the repeal, in part, on promoting public access to CHAs. It says that promoting public access is not a permissible goal under AS 16.20.500.[80] The State responds that improving recreational access in CHAs is recognized as a legitimate goal in the management plan. But we need not consider the management plan to conclude that promoting public access is a

---

[78]     *See* AS 16.20.510, .530.

[79]     *See Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 528 (Alaska 1993) ("Whenever possible, this court interprets each part or section of a statute with every other part or section, so as to create a harmonious whole." (citing *Forest v. Safeway Stores, Inc.*, 830 P.2d 778, 781 (Alaska 1992))).

[80]     Inletkeeper also argues that ADF&G's "mission" of promoting public access "is not found in any of the statutes or regulations governing CHAs." But "maintain[ing] and improv[ing] public access" is one of the goals of the management plan, which have been adopted by regulation. *See* ADF&G, *supra* note 8, at 5; 5 AAC 95.610.

legitimate regulatory purpose under AS 16.20.500. As with oil and gas leasing in some CHAs,[81] the legislature has expressly recognized that public uses including "mechanized and nonmechanized public access" may be compatible with habitat protection.[82] Thus, public access is not per se inconsistent with AS 16.20.500. Accordingly, the Commissioner did not "pursue[] impermissible objectives" by considering the promotion of both habitat protection and public access.[83]

Our interpretation of the CHA statutes is buttressed by, rather than in conflict with, the management plan. The management plan's primary goal includes "[m]inimizing the degradation and loss of habitat values" and "[m]inimiz[ing] harmful disturbances to wildlife."[84] And it defines "minimizing" as reducing harmful effects "to a level which does not have a significant adverse impact on" fish, wildlife, or their habitat.[85] ADF&G thus recognizes that some adverse effects are permissible in CHAs. Further, the plan's second goal is to "maintain and enhance public use of fish, wildlife and critical habitat area lands and water consistent with" protecting habitat.[86] And one of the strategies for meeting that goal is to "[m]aintain or improve public access to"

---

[81]   *See* AS 16.20.615(e).

[82]   *See, e.g.*, AS 16.20.610(d) (directing ADF&G to allow public access "to the extent that" it is compatible with "the protection and enhancement" of lesser sandhill crane habitat and "the continued public use and enjoyment" of Dude Creek CHA); AS 16.20.625(e) (directing ADF&G to permit "snowmachining, boating, and the landing of aircraft" in Redoubt Bay CHA "in a manner that is compatible with the purpose for which the [CHA] is established").

[83]   *See Grunert v. State*, 109 P.3d 924, 930 (Alaska 2005) ("The apparent focus on economic development and utilization does not establish that the regulation exceeded the board's statutory authority, nor does the lack of prominence of a goal of regulating conservation.").

[84]   ADF&G, *supra* note 8, at 5.

[85]   *Id.* at 6.

[86]   *Id.* at 5.

CHAs.[87]  In other words, ADF&G has long interpreted the CHA statutes to permit some level of adverse effects on habitat and to contemplate public access as a legitimate regulatory purpose.[88]  This longstanding interpretation weighs in favor of our conclusion.[89]

In light of the discretion the legislature has afforded the Boards and Commission in making compatibility determinations, and given the legislature's decision to allow some uses that have adverse impacts on habitat in CHAs, we hold that the repeal of 5 AAC 95.310 was consistent with the CHA statutes' primary purpose of protecting "habitat areas especially crucial to the perpetuation of fish and wildlife."[90] The legislature's intent that incompatible uses should be restricted in order to preserve habitat necessarily implies that some uses *will* be compatible.  And the legislature expressly identified as compatible some uses that have clear adverse impacts on habitat.

### 2.    The legislative history

"We decide questions of statutory interpretation on a sliding scale: '[T]he plainer the language of the statute, the more convincing contrary legislative history must be' " for our interpretation to deviate from the ordinary meaning of the text.[91]

Inletkeeper argues that the CHA statutes' legislative history "confirms that the legislature intended to create special protections within the CHAs."  In support, it points to a letter from Governor William Egan to Rep. Eugene Guess in which the governor observed that AS 16.20.500 would "allow only those uses which are

---

[87]    *Id.*

[88]    ADF&G promulgated the management plan in 1993. *Id.* at 12.

[89]    *See Usibelli Coal Mine, Inc. v. State, Dep't of Nat. Res.*, 921 P.2d 1134, 1142-43 (Alaska 1996).

[90]    AS 16.20.500.

[91]    *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011) (alteration in original) (quoting *Alaskans for Efficient Gov't, Inc. v. Knowles*, 91 P.3d 273, 275 (Alaska 2004)).

compatible with the continued maintenance of high quality habitat for the State's renewable wildlife resource."[92]  Although we have recognized that a transmittal letter from the governor's office can be probative of legislative intent,[93] the statutes at issue here were not requested by the governor.[94]

But more fundamentally, the legislative history that Inletkeeper cites does not conflict with our reading of the statutes.  Governor Egan's letter offers no support for Inletkeeper's strict reading of compatibility — it simply restates the language in AS 16.20.500.  Further, it is consistent with the broad mandate to restrict uses not compatible with habitat conservation.

In sum, we conclude that the repeal of 5 AAC 95.310 is consistent with the purpose of the CHA statutes.  The statutes' language reflects a legislative choice to leave compatibility determinations to the Boards and Commissioner.  Thus, the validity of the compatibility determination here will turn on whether the Commissioner "has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making."[95]

## C.    The Repeal Of 5 AAC 95.310 Was Reasonable And Not Arbitrary.

While the Commissioner has the discretion to allow compatible uses in CHAs, this discretion has limits.  Even a rule that is consistent with its enabling statute must still be "reasonable and not arbitrary."[96]

---

[92]     1972 H. Journal 1790.

[93]     *See, e.g.*, *Forrer v. State*, 471 P.3d 569, 598 (Alaska 2020).

[94]     *See* 1972 H. Journal 235.

[95]     *See Ellingson v. Lloyd*, 342 P.3d 825, 830 (Alaska 2014) (quoting *Interior Alaska Airboat Ass'n, Inc. v. State, Bd. of Game*, 18 P.3d 686, 690 (Alaska 2001)) (internal quotation marks omitted).

[96]     *Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971).

In determining whether a rule is reasonable, "we scrutinize process, not policy";[97] we do not "examine the content of the regulation [or] judge its wisdom."[98] "Our role is to ensure only that the agency has taken a 'hard look at the salient problems and has genuinely engaged in reasoned decision making.' "[99] That said, "we do stress that the regulation must be reasonably related to its goal."[100] "The agency must take a close look at the problems it seeks to address and consider important policy factors . . . ."[101] An agency's failure to consider those factors will render its decision arbitrary.[102]

In broad terms, Inletkeeper's arguments about the arbitrariness of the repeal fall into three categories: the repeal ran counter the scientific evidence and the professional opinions of staff, the repeal was a predetermined outcome, and the repeal conflicted with existing regulations and agency policy. The State asserts that the repeal accurately reflected available scientific data, and it denies that the repeal was either predetermined or in conflict with regulations or policy. We agree with the State.

1. **The record establishes that the Commissioner took a "hard look" at relevant scientific studies and considered the opinions of ADF&G staff.**

Inletkeeper's challenge to the sufficiency of scientific evidence supporting the repeal of 5 AAC 95.310 is largely founded on the repeal's divergence from the 2000

---

[97]     *Ellingson*, 342 P.3d at 830-31 (citing *Interior Alaska Airboat Ass'n, Inc.*, 18 P.3d at 693).

[98]     *Id.* at 831 (alteration in original) (quoting *Kingery v. Chapple*, 504 P.2d 831, 835 (Alaska 1972)) (internal quotation marks omitted).

[99]     *Grunert v. State*, 109 P.3d 924, 929 (Alaska 2005) (quoting *Interior Alaska Airboat Ass'n, Inc.*, 18 P.3d at 690).

[100]     *Ellingson*, 342 P.3d at 831 (citing *Meier v. State, Bd. of Fisheries*, 739 P.2d 172, 174 (Alaska 1987)).

[101]     *Id.*

[102]     *Id.* (citing *Interior Alaska Airboat Ass'n, Inc.*, 18 P.3d at 693).

and 2017 literature reviews, both of which ultimately supported the jet ski ban. Because the Commissioner reached a different conclusion based on the same evidence, Inletkeeper claims that the repeal was made "without any scientific bases or underpinning whatsoever." The State argues that the Commissioner, as a biologist, was entitled to reconsider the evidence in both literature reviews. And it asserts that the evidence underlying the recommendations in both reviews "was far from clear."

We determine that the record supports the Commissioner's conclusion that the science behind 5 AAC 95.310 was less than conclusive. The 2017 literature review of scientific studies, though concluding that "there [was] no new information that would warrant rescinding the prohibition," noted that the information it considered "[did] not precisely match the conditions" in the CHAs at issue here. That is, few if any studies examined "northern latitude marine waters with a wide range of biological and human uses." The 2017 review also recognized that technological improvements had addressed "one of the primary environmental concerns" raised in the 2000 review, and acknowledged that "it cannot be said that all [jet skis] are more disruptive than all other boats."

In the decisional document accompanying the repeal, the Commissioner recognized these shortcomings in the scientific literature. The Commissioner noted that no prior scientific authorities had studied "a marine environment comparable to Kachemak Bay," and that jet ski engines had become quieter due to technological improvements made since 5 AAC 95.310 was enacted. The Commissioner also noted that concerns about jet ski use mostly reflected operator behavior rather than the vessels' impact on habitat. Consistency between the literature review and the decisional document accompanying the repeal demonstrates that the Commissioner "has taken a hard look at the salient problems" and made his decision based on the scientific

information available to him.[103]  Although the 2017 literature review opined that a litany of studies would be necessary before the ban "should be relaxed," agencies are not required to commission a new study each time they propose regulatory action where relevant information is already available.[104]  And Inletkeeper has not pointed to other information that was available to the Commissioner that he did not consider.

Likewise, the record undercuts Inletkeeper's argument that the Commissioner disregarded the "unanimous[] support[] by an interagency planning team and ADF&G staff."[105]  As the State points out, one ADF&G staff member responded to the 2017 literature review by noting his belief that ADF&G "wouldn't have much of a problem if [it] opened [the Kachemak Bay CHA] up to [jet ski] use."  Further, the staff member "didn't see any studies clearly demonstrating adverse impacts to fish and/or wildlife."  And the Commissioner testified that staff were divided on the issue. The record establishes that the Commissioner "utilize[d], rather than ignore[d], the analysis of [the agency's] experts."[106]

In sum, the record shows that the Commissioner appropriately focused on whether jet skis have any appreciable impact on wildlife and habitat in CHAs.  In his deposition, the Commissioner stated he "was looking at whether or not Jet Skis were

---

[103]    *Manning v. State, Dep't of Fish & Game*, 355 P.3d 530, 535 (Alaska 2015); *State v. Kenaitze Indian Tribe*, 83 P.3d 1060, 1069 (Alaska 2004).

[104]    *Kenaitze Indian Tribe*, 83 P.3d at 1068 (holding information relevant to agency's decision "was not so altogether lacking that the [agency] had a duty" to obtain more information).

[105]    We also question the relevance of Inletkeeper's claim that the Commissioner himself "affirmatively believed that" jet skis should be, and in fact were, prohibited in the Fox River Flats CHA.  The Commissioner intended for the repeal of the ban in Fox River Flats to be replaced by a no-wake zone implemented through the management plan.  We agree with the State that this "is a reasonable approach."

[106]    *See Alaska Ctr. for the Env't v. Rue*, 95 P.3d 924, 932 (Alaska 2004) (quoting *Ctr. for Biological Diversity v. Lohn*, 296 F. Supp. 2d 1223, 1239 (W.D. Wash. 2003)) (internal quotation marks omitted).

impactful" to fish and wildlife habitat relative to other activities that are allowed in the CHAs. The decisional document also confirms the Commissioner's primary consideration was habitat protection, reflecting meaningful engagement with this issue. The record thus establishes that the Commissioner considered whether the repeal was consistent with habitat protection and that the Commissioner "genuinely engaged in reasoned decision making."[107]

### 2. The record does not establish that the repeal of 5 AAC 95.310 was a predetermined outcome.

Inletkeeper points to several parts of the record, including emails from the governor's office and decisional documents, which it says prove that the repeal was predetermined either by the Commissioner, the governor, or both. We conclude that those claims are unfounded.

### a. The record does not establish that the governor predetermined the repeal.

Inletkeeper first asserts that "the Governor, not the [Commissioner], first decided to repeal 5 AAC 95.310." In support, Inletkeeper points to two emails from the governor's office. In the first email, Inletkeeper claims that the governor's chief of staff directed the Commissioner's special assistant to "[f]ollow the direction of the . . . the [governor]"; that is, to obey the governor's preordained decision to repeal 5 AAC 95.310. But Inletkeeper omits crucial language and context — the chief of staff wrote that "all [the governor's office] can ask" was that the special assistant "[f]ollow the direction of [the Commissioner] and the [governor]." Further, the chief of staff was responding to an email from the special assistant relaying that the Commissioner had said, "The decision in [sic] mine as the Commissioner." It is unremarkable that the chief of staff asked the special assistant to "[f]ollow the direction of" both the Commissioner and the governor. Such a request falls far short of establishing causality

---

[107] *Kenaitze Indian Tribe*, 83 P.3d at 1067.

between the governor's preliminary policy goal and the repeal. This is especially apparent considering that the request was made in response to the Commissioner's prior declaration of his decisionmaking authority.

Pointing to a second email, Inletkeeper claims that the "Governor's office told a [jet ski] advocate . . . months before public notice, that the repeal would occur." But that email, sent from the advocate to the Commissioner's special assistant, merely claims someone in the governor's office told her "they *were working on language*" to allow jet skis in Kachemak Bay CHA. (Emphasis added.) Such tentative language falls short of establishing that the governor's office was certain that the repeal would occur, much less that the governor predetermined the outcome of the regulatory process.

### b. The record does not establish that the Commissioner predetermined the repeal.

Alternatively, Inletkeeper claims that the Commissioner predetermined the repeal, and he ignored standard agency process and manipulated public support to reach his desired result. These claims are not persuasive.

Inletkeeper first references a 2019 email that the Commissioner sent to his special assistant about the prohibition in which he told the assistant to "[s]trike it all," which it says proves that the repeal was a foregone conclusion. But the Commissioner made this statement in response to the assistant's suggestion that the repeal should be accomplished via a "strike thru" rather than amending the language. Because the Administrative Procedure Act requires agencies to provide notice of proposed regulations before adopting them, it was appropriate for the Commissioner's office to craft proposed language before receiving public comments.[108] Deciding to pursue the repeal of 5 AAC 95.310 before reviewing public input does not mean the decision to implement the repeal was predetermined or arbitrary. Any regulatory change necessarily starts with a decision and proposal to make the change, whether initiated by

---

[108] AS 44.62.190.

a petition from the public or by the agency itself.[109] And the Commissioner stated in a deposition that he had not decided to enact the repeal until after he reviewed the public comments.

Inletkeeper's claim that that the Commissioner impermissibly drafted the decisional document for the repeal before considering public comments is similarly unpersuasive. Inletkeeper cites *Ship Creek Hydraulic Syndicate v. State, Department of Transportation & Public Facilities*,[110] but our holding in that case was limited to an agency's decision to take private property for public use.[111] Government takings implicate a set of constitutional concerns that are clearly distinct from the concerns in this case.[112] Further, the final decisional document in this case accounted for public comments and acknowledged concerns raised in those comments. Considering that the final document addressed public sentiment, the draft's timing does not suggest that the Commissioner ignored public concerns.

Inletkeeper asserts that the Commissioner intentionally excluded some regulatory staff from the process underlying the repeal in order to reach the alleged predetermined outcome. Two staff scientists confirmed they were not involved in the repeal. But the Commissioner considered opinions of other staff and the staff opinions reflected in the 2017 literature review. And the Commissioner is entitled to rely on his

---

**109** *See id.* (requiring notice of proposed action prior to public comment); AS 44.62.220 (giving "an interested person" right to petition agency for adoption or repeal of regulation).

**110** 685 P.2d 715 (Alaska 1984).

**111** *Id.* at 718 ("We think that 'quick-take' decisions deserve explanation, and that the necessary explanations should be made in a decisional document filed contemporaneously with the declaration of taking.").

**112** *See id.* at 717-18 (noting that decisional documents for takings decisions will "aid property owners in understanding why their property, and not someone else's is being taken" and may strengthen procedural due process protections).

own expertise in making regulatory decisions;[113] he need not consult with any particular staff members.

Inletkeeper also alleges the Commissioner inflated public support for the repeal by including unverifiable survey responses in its tally of public comments. Agencies may not manipulate data to establish a prerequisite for a regulatory action.[114] In *Manning v. State, Department of Fish & Game*, we cautioned that an agency could not manipulate the amount of harvestable caribou that was reasonably necessary for subsistence to justify a less restrictive hunt where a certain number of caribou was a threshold for opening that hunt.[115] And in *Native Village of Elim v. State*, we stated that when setting harvesting caps, an agency could not group fish stocks together so as to inflate the amount of fish available for subsistence users.[116]

But unlike the determinations at issue in *Manning* and *Native Village of Elim*, where the volume of the relevant data had some bearing on the validity of the agency's decision, there is no requisite volume of public support necessary for the Commissioner to repeal 5 AAC 95.310. Instead, the decision to repeal the prohibition is based on whether jet ski use is compatible with the primary purpose of CHAs.[117] The Commissioner used public comments to examine substantive concerns about the prohibition and about repealing it. But because the Commissioner did not have to establish a threshold amount of public support before repealing the prohibition,

---

[113]    *See State v. Kenaitze Indian Tribe*, 83 P.3d 1060, 1070 (Alaska 2004).

[114]    *See Manning v. State, Dep't of Fish & Game*, 355 P.3d 530, 536 (Alaska 2015).

[115]    *Id.* at 532, 536.

[116]    990 P.2d 1, 11 (Alaska 1999).

[117]    AS 16.20.500.

counting some flawed or unverifiable responses does not make the repeal arbitrary under the facts and circumstances here.[118]

### 3. The repeal of 5 AAC 95.310 is consistent with existing regulations and policy.

Inletkeeper argues that the repeal of 5 AAC 95.310 was arbitrary because it conflicts with both the management plan and a cooperative agreement between ADF&G and DNR. The State asserts that the cooperative agreement is not controlling here, and that the repeal was nonetheless consistent with both. We agree with the State.

Inletkeeper is correct that the management plan's goals and policies apply to "[a]ll department management decisions . . . , whether affecting activities undertaken by [ADF&G] . . . or the public," and are "in accordance with the purpose for which the [CHAs] were established."[119] Inletkeeper asserts that the Commissioner, by repealing 5 AAC 95.310, "ignored" the management plan's goals and policies, which "provide[] a framework for defining appropriate actions within the CHAs." The State argues that the repeal was consistent with the management plan's definition of "compatibility," and that definition turns on whether a use "causes *significant* impact to" fish, wildlife, and their habitat. (Emphasis in original.) The State also maintains that because the Commissioner found that the science was "inconclusive" on jet skis' impacts to habitat in CHAs, the repeal was not in conflict with the management plan's habitat protection goals.

Two of the management plan's more relevant goals are to "[m]inimize the degradation and loss of habitat values due to habitat fragmentation" and to "[m]inimize

---

[118] The Commissioner counted comments and petition signatures from forms that included some false and obviously false or unverifiable names. However, the Commissioner's final tally indicated that 1,677 individuals supported the repeal and 1,005 commenters opposed it, while Inletkeeper highlights eight suspect responses.

[119] *See* ADF&G, *supra* note 8, at 5.

harmful disturbance to wildlife."[120] The management plan in turn defines "minimize" as "[t]o reduce harmful effects to a level which does not have a significant adverse impact on fish or wildlife populations or their habitat"; it defines "harmful disturbance" as "[a]ctivities which displace animals from their natural habitat or interrupt their seasonal activities at a frequency or duration which causes significant impact to fish and wildlife populations."[121] The Commissioner's interpretation of the management plan plainly aligns with this language. Further, the decisional document accompanying the repeal expressly noted the lack of relevant evidence on jet ski impacts in northern marine environments; it also accounted for technological advancements that reduced emissions and noise from jet ski engines. The repeal was thus consistent with the management plan's goal of protecting habitat by restricting uses with significant adverse effects to habitat.

Inletkeeper also asserts that the Commissioner "ignored" ADF&G and DNR's cooperative agreement, which "created a confusing and inconsistent regulatory regime" in parts of the Kachemak Bay CHA. Specifically, Inletkeeper notes that "[jet skis] are both legal *and* illegal in certain parts of Kachemak Bay." The State argues that the agreement is not enforceable by the public. And regardless, the State asserts that the repeal was consistent with the agreement because the Commissioner consulted with DNR prior to the repeal. We conclude that the cooperative agreement is not controlling here. The agreement expressly says it "in no way alters existing authorities and responsibilities either between or within the agencies." Nor could the agreement alter the scheme expressly provided for by the legislature.[122] And finally, it is

---

[120]    *Id.*

[121]    *Id.* at 5-6.

[122]    *Cf. Warner v. State, Dep't of Com. & Econ. Dev., Real Est. Comm'n*, 819 P.2d 28, 32 (Alaska 1991) (holding agency could not, absent statutory authority, alter process for real estate surety fund claim established by legislature).

unremarkable that jet skis are still prohibited in areas of Kachemak Bay under DNR's jurisdiction — the fact that laws change from one area to another is the essence of jurisdiction itself.[123]    Thus, the repeal is not arbitrarily inconsistent with the management plan or cooperative agreement.[124]

In conclusion, the Commissioner's decisional document reflects that he considered habitat preservation and protection and decided to repeal the ban based on his own expertise, his assessment of scientific literature, and staff opinions.  Inletkeeper does not point to existing information that the Commissioner should have additionally considered.  In light of the Commissioner's demonstrated consideration of relevant scientific evidence, staff opinions, and public comments, we conclude that he took the necessary "hard look at the salient problems" and "genuinely engaged in reasoned decision making."[125]    Inletkeeper's claim that the repeal was predetermined is unsupported by the record and does not establish that the Commissioner's decision was arbitrary.[126]    Therefore, even after drawing all reasonable inferences in Inletkeeper's

---

[123]    To the extent Inletkeeper is arguing that jet skis may be "both legal *and* illegal" in the exact same location, i.e. where ADF&G's and DNR's jurisdiction overlaps, we disagree.  The Commissioner's decision not to restrict jet ski use has no bearing on DNR's ability to exercise its own regulatory authority in areas under its jurisdiction.

[124]    Inletkeeper also argues that the repeal conflicts with the management plan and cooperative agreement as a matter of law.  Even assuming the requirement that a regulation not "conflict[] with any other state statutes or constitutional provisions" extends to other regulations, we would reject this argument for the same reasons as explained above. *See Grunert v. State*, 109 P.3d 924, 929 (Alaska 2005).

[125]    *See Interior Alaska Airboat Ass'n, Inc. v. State, Bd. of Game*, 18 P.3d 686, 690 (Alaska 2001).

[126]    *See State v. Kenaitze Indian Tribe*, 83 P.3d 1060, 1067 (Alaska 2004); *see also Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1185-86 (10th Cir. 2014) (rejecting argument that "agency's subjective desire to reach a particular result must necessarily invalidate the result" where "agency relied on objective scientific evidence" in reaching its conclusion).

favor for purposes of granting summary judgment for the State, we conclude that, based on the record, the repeal was reasonable and not arbitrary.[127]

## V.    CONCLUSION

The summary judgment order of the superior court is REVERSED, and the case is REMANDED for entry of summary judgment in favor of the State and further proceedings consistent with this opinion.

---

[127]    *See Fischer v. Kenai Peninsula Borough Sch. Dist.*, 548 P.3d 1086, 1091 (Alaska 2024) ("[A] material fact is one upon which resolution of an issue turns." (alteration in original) (quoting *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 519 (Alaska 2014))); *Alakayak v. Brit. Columbia Packers, Ltd.*, 48 P.3d 432, 449 (Alaska 2002) (explaining "[r]easonable inferences are those inferences that a reasonable factfinder could draw from the [] evidence").